## FITTS *v.* CITY OF ATLANTA.

1. The ordinance of the City of Atlanta (Municipal Code, sec. 1841), declaring it unlawful to hold public meetings in the streets of that city without the consent of the municipal authorities, is not unconstitutional either because it curtails or restricts the liberty of speech, or makes an arbitrary discrimination in favor of some persons against others, or because the city had no legal power to enact it; nor is such ordinance void upon the ground that it is an unreasonable and oppressive exercise of police power.

2. The act approved December 19, 1893 (Acts 1893, p. 173), entitled, "An act to amend the charter of the City of Atlanta, to wit, the act incorporating the City of Atlanta, approved February 28th, 1874," etc., and empowering the mayor and general council of such city to provide by ordinance for the regulation of public meetings and public speaking in its streets, by preventing the obstruction of the same or the gathering of disorderly crowds thereon, is not violative of that provision of the constitution which prohibits the passage of any statute containing matter different from that which is expressed in the title thereof. *Sayer* v. *Brown,* 120 *Ga.* 539, and cit.

3. Where it appeared that the accused violated a municipal ordinance for the previously announced purpose of testing its constitutionality, it was not error to refuse to continue the case made against him, merely to give his counsel time to investigate the constitutional questions claimed to be involved therein.

4. The allegations in the petition for certiorari as to the circumstances which it was claimed disqualified the mayor, as acting recorder, to try the petitioner were not only not verified by the answer, but were expressly denied therein. Neither did the answer verify the statements made in the petition in reference to the petitioner being required, under the sentence imposed, to work upon the public works.   "Points made in a petition for certiorari not verified by the answer of the trial judge present nothing for determination either by the superior or the Supreme Court."

5. When the penalty is left by the statute to the discretion of the trial judge, within certain fixed limits, his judgment will not be disturbed, upon the ground that the sentence was excessive, if the penalty imposed does not exceed the limit provided.

6. Where complaint was made in a petition for certiorari that the trial court overruled objections to the testimony of named witnesses upon designated subjects, without setting forth, either literally or in substance, the testimony to which the objections were made, an assignment of error that the court erred in overruling such objections was not well taken.

7. The certiorari was properly overruled.

Argued November 21, 1904.—Decided January 26, 1905.

Certiorari.   Before Judge Lumpkin.   Fulton superior court. September 2, 1904.

*Alonzo Field* and *A. M. Brand,* for plaintiff in error.
*James L. Mayson* and *William P. Hill,* contra.

FISH, P. J. J. L. Fitts was adjudged guilty, in the recorder's court of the City of Atlanta, of violating a certain municipal ordinance, and sentence was imposed on him therefor. He took the case by certiorari to the superior court, where, upon the hearing, the certiorari was overruled. Thereupon he sued out a writ of error to this court. Our learned brother Lumpkin, who presided in the superior court, rendered an opinion in the case, which comes up in the record and which is as follows:

"This case presents a contest of strength between 'Prof.' Fitts and a municipal ordinance of the City of Atlanta. The two are diametrically opposed to each other, and one must yield. There is no half-way ground. If the ordinance was a legal and valid ordinance, Prof. Fitts's conduct was illegal. If the Professor is right, the ordinance is illegal. The ordinance is contained in the Municipal Code of 1899, and reads as follows: 'Sec. 1841. The president, chairman, or other officer, or committee of men, or any persons who desire or intend to call a public meeting of the citizens of Atlanta, for political purposes, shall notify the mayor, or chief of police, of such desire or intent, and of the time and place of the meeting, before said meeting is called; and upon failure to do so, upon conviction thereof shall be fined not exceeding fifty dollars and cost, or be imprisoned in the calaboose of the city not exceeding thirty days, in the discretion of the recorder's court; and upon receiving such notice it shall be the duty of the mayor or chief of police, to attend such meeting with a sufficient police force to preserve peace and order; provided, it shall not be lawful to hold any such meeting in any of the public streets of the City of Atlanta without the consent of the mayor and council, or the mayor and chairman of the board of police commissioners of the City of Atlanta; and any person calling or holding any public meeting, in any of the streets of the City of Atlanta, without such consent, shall, upon conviction thereof in the recorder's court of said city, be fined in a sum not exceeding one hundred dollars, or imprisonment not exceeding thirty days, in the discretion of the court.' The plaintiff in certiorari appears to have made two or three speeches on the streets of Atlanta under permit or consent from the mayor and chairman of the board of police commissioners; but his permit was withdrawn. Afterwards he determined to speak on the streets either with or without a permit

or consent; and failing to obtain one, he proceeded in defiance of the ordinance and in spite of it. Handbills were issued and scattered, of which the following is a copy:

'GREAT SENSATION!

TESTING A CITY ORDINANCE.

FREE STREET LECTURE

ON SOCIALISM BY

Prof. J. L. Fitts, of South Carolina.

Monday, August 17th 8 P. M. Corner of Broad and Marietta streets. Prof. Fitts has been refused a permit. He will speak under the right guaranteed by the 1st Amendment to the United States Constitution, which was proposed by Jefferson and approved by Washington. If interrupted, the case will be carried to the United States Supreme Court. Shall we, who built the streets, be deprived of their use for lawfully assembling to discuss our condition and needs? Come and see. Be early and get a good place. *Don't block sidewalks or streets.* The Committee.'

"The petition states that this was admitted in evidence over objection on the ground that there was no evidence that said Fitts had it printed or circulated, and it was irrelevant; but there is no assignment of error on any such grounds nor does the mayor verify this statement in his answer to the writ of certiorari. The answer states that 'as part of its evidence, the city introduced the poster which Fitts scattered over the city, as set forth in paragraph 10 of the writ of certiorari.' Having gathered his crowd in a public street in the very heart of the business portion of the city, he proceeded to make his test of the ordinance and speak without any permit or consent. At the appointed time, among those who answered his invitation were members of the police force; and, as he had announced a desire to make a test of the law, they accommodated him by arresting him when he refused to desist from speaking on the street; and on his trial in the recorder's court, the mayor presiding adjudged him guilty. He brings the case to this court by writ of certiorari. The assignments of error are numerous, but the leading ground of his attack upon the ordinance is, in substance, that the constitutions of the United States and of the State guarantee freedom of speech, and that under this guarantee he had a constitutional right to hold meetings and make speeches in the streets of Atlanta, and the

ordinance which prevented his doing so without a permit or consent of the municipal officers was invalid. In several respects the answer of the mayor to the writ of certiorari does not agree with the petition, and, not being traversed, it must control. The petition is only taken as correct where verified by the answer: 114 *Ga.* 320. For instance the answer contains the following: ' On the night of the arrest of Fitts, the permit had been withdrawn; but Fitts spoke in defiance of the authorities of the city, and went out into Marietta street, gathered a crowd around him, and began his speech. The sidewalk was not blocked, but the crowd gathered around Fitts in the street. The language used by Fitts was not obscene or vulgar, but on the night of his arrest he had no permit to speak, issued either from the mayor or any one else. He took a box and placed same out upon the roadway, and standing thereon undertook to gather a crowd around him, and undertook to make a speech.' In the evidence of the chief of police occurred the following: ' The sidewalk was not blocked, but people had gathered around Fitts out in the street. The people in the street, of course, obstructed the street where they stood.' Another witness states that ' The language of Fitts was not obscene, but was that calculated to arouse strife and discord and cause revolution. He represented the socialists, and seemed to be trying to convert the people to his way of thinking by a text [attacks] upon the Government, Legislature, Capital, etc.' Further on in the answer it is stated that ' The people gathered around him out in the street, and when they undertook to arrest Fitts a number of his sympathisers became very much excited, and it was necessary to arrest them in order to disperse the assembly.'

"The primary object of streets is for public passage. They should be kept open and unobstructed for that purpose. If damage accrues to passers by reason of improperly allowing them to be used for other purposes, the city may become liable. The streets of the city are peculiarly within the police control for the purpose of preserving and protecting their use by the public as thoroughfares. A man has many constitutional and legal rights which he can not lawfully exercise in the streets of a city. Thus, every citizen has a right to lawfully acquire and hold personal property; but he has no right, constitutional or otherwise, to insist

on storing his possessions in the street.  Every man has the ina-
lienable right to sleep and eat (if he. has the edibles), but he has
no constitutional right to make his bed or set his table in the
street.  Every man has not only the right to, but he should, bathe
and cleanse himself, and change his raiment, if he has a change.
This is a duty imposed by his individual constitution, if not by
that of his country.  But there is no constitutional right on his
part to perform his ablutions or exercise the most necessary
demands of his nature in the public streets.  At proper times and
in proper places, one may make loud noises, or shoot a gun, or
test his lung power vocally to a considerable extent, without of-
fending against any law; but there is no right, inherent or consti-
tutional, to make vociferous outcries or practice gunnery in the
street.  If Prof. Fitts's idea of constitutional law were correct, I
see no reason why every citizen should not claim a right to use
the public streets for the exercise of his trade, calling, or profes-
sion, which may be much more essential to his welfare, and that
of the public, than speechmaking by the plaintiff in certiorari,
however eloquent, and regardless of the soundness or unsoundness
of his argument.  If the constitution, State or Federal, guarantees
to Prof. Fitts the right to make public speeches on the streets of
Atlanta, why does it not also guarantee the same right to every
lecturer who may not desire to hire a hall, and to every showman
who wishes to exhibit on the highway, or to every mechanic,
artisan, merchant, or other citizen the right to ply his lawful voca-
tion in the public thoroughfare?  The constitutional right to ex-
ercise one's lawful vocation is quite as sacred and often more
important than the right to make speeches, but the exercise of
either right must yield to the municipal power properly exercised
over the streets for the primary objects for which they were
established.  If every one who has some constitutional right has
also the constitutional right to exercise it in the streets of a city,
regardless of municipal regulations, these thoroughfares may soon
become a gathering place. of a numerous clan rivaling those ad-
juncts of modern exhibitions which, since the term was used dur-
ing the Columbian Exposition at Chicago in 1893, have come to
be distinguished by the name of ' Midway Plaisance.'  The right
of the public in regard to the streets is to use them for passage as
public highways, provided they are used lawfully for that purpose.

But even the right of passage is subject to reasonable legislative regulations for the general good. Thus, idling and loitering in the public streets has generally been prohibited, and no one has yet doubted the constitutionality of such legislation.

"In the handbill above referred to the question is asked, 'Shall we, who built the streets, be deprived of their use for lawful assembling to discuss our conditions and needs?' Who comprise the 'committee' signing this handbill, or whether Prof. Fitts was a part of it, or all of it, does not appear. But as it is shown that he was from another State, and, so far as disclosed, neither a citizen, taxpayer, property owner, nor resident of Atlanta, it is not quite clear how this question has any relevancy, or how he was one of the 'we' who built the streets of the city, or how he derived any peculiar right to use them as a forum or lecture-hall because they have cost the municipality or the taxpayers or the abutting property owners money to pave, or repair, or keep' in order for public travel. I fear that Prof. Fitts has confused in his mind the constitutional right of freedom of speech with an imaginary, though non-existing, right to hold public meetings and make speeches in the public streets regardless of municipal laws or regulations. It is true that under an ordinance prohibiting speaking on the streets without a permit, and a charge that he violated such ordinance, the defendant could not be convicted of the offense of obstructing the streets, arising under another ordinance, although he might be guilty of both offenses; but in considering the reasonableness or propriety of the ordinance on the subject of speaking on the public streets, and the necessity for police regulation and control of that subject, the liability to cause obstructions in the streets, interfering with public passage and causing disorder, is a matter for consideration. Neither the prohibition placed on Congress by the first amendment of the constitution of the United States, whereby it was declared that 'Congress shall make no law abridging the freedom of speech,' nor the provision of the constitution of this State which declares that no law shall be passed curtailing or restraining the liberty of speech, confers any constitutional right to gather crowds and make public orations in the streets of a city, regardless of the municipal control over them. If, then, the plaintiff in certiorari (the defendant in the recorder's court) had no absolute or constitutional right to use

the public streets of Atlanta as a place to gather an audience and speak, is the ordinance void on the ground that it makes an arbitrary discrimination in favor of some against others, because it requires a permit or consent to be obtained, and prohibits holding public meetings on the streets without one?  Under the general powers usually conferred on cities, or what is sometimes spoken of as the 'general welfare clause' in municipal charters, the corporate authorities could pass reasonable regulations for the preservation and keeping of their streets open and unobstructed for travel and preventing disorder upon them.  Not content with this general power, the City of Atlanta obtained an amendment to its charter in 1893, which contains the following language:  'The mayor and general council of said City of Atlanta is empowered to provide by ordinance for the regulation of public meetings and public speaking in the streets of said City of Atlanta, by preventing the obstruction of the streets of said city or the gathering of disorderly crowds in said streets.'  City Code of 1899, 48.  The ordinance quoted above does not on its face make any discrimination or say that certain persons, or persons of certain classes, might speak on the streets and certain others should not do so. It says that none shall do so without a permit or consent from certain officers.  By its own terms it is not discriminative.  Is it invalid because it requires a permit or consent before any person shall be allowed to speak on the streets, or because it provides for the granting of such permit by the mayor and chairman of the board of police commissioners?

"Counsel for plaintiff in certiorari have cited but one case on this subject, that of Yick Wo v. Hopkins, 118 U. S. 356–374. In that case an ordinance was passed which contained the following provision: 'Sec. 1.  It shall be unlawful, from and after the passage of this ordinance, for any person or persons to establish, maintain, or carry on a laundry within the corporate limits of the city or county of San Francisco, without having first obtained the consent of the board of supervisors, except the same be located in a building constructed either of brick or stone.'  Other sections of the ordinance prohibited the erection or maintaining of any scaffolding on any building without obtaining written permission of the board of supervisors, and provided punishment for a violation of the ordinance.  Yick Wo and others were imprisoned for

violating this ordinance.    The case arose on the application for a writ of habeas corpus.    On the return of the writ and the hearing then had, the evidence plainly showed that the great majority of the laundries in the city were operated by Chinamen in wooden buildings; that the board of supervisors arbitrarily refused to consent for them to continue to do business in these wooden buildings, although a similar right was granted to Caucasians.    Yick Wo showed that he had a city license which had not expired; that he had been engaged in the laundry business in the same premises and building for twenty-two years previously; that he had a license from the board of fire wardens, which showed that they had inspected the premises and found all proper arrangements for carrying on the business; that the stove, washing and drying apparatus, etc., were in good condition and their use not dangerous to the surrounding property from fire; and that all proper precautions had been taken to comply with the provisions of the ordinance in respect to the fire limits and making regulations concerning the erecting and use of buildings in the city; and also that he had a certificate from the health officer, showing that the premises had been inspected by him and found to be sufficiently and properly drained, and that all proper arrangements for carrying on the business of a laundry without injury to the sanitary conditions of the neighborhood had been complied with.    Under the facts disclosed, the Supreme Court of the United States held that the ordinance and its administration were evidently intended to discriminate against the Chinese on account of their race, and that it was an arbitrary effort to drive them out of business in favor of their Caucasian rivals.    The following extract from the opinion of Mr. Justice Matthews will serve to indicate the real basis of the decision.    'It appears that both petitioners have complied with every requisite deemed, by the law or the public officers charged with its administration, necessary for the protection of neighboring property from fire or as a precaution against injury to the public health.    No reason whatever, except the will of the supervisors, is assigned why they should not be permitted to carry on, in the accustomed manner, their harmless and useful occupation, on which they depend for a livelihood.    And while this consent of the supervisors is withheld from them and from two hundred others, who have also petitioned, all of whom happened to be

Chinese subjects, eighty others, not Chinese subjects, are permitted to carry on the same business under similar conditions. The fact of this discrimination is admitted. No reason for it is shown, and the conclusion can not be resisted that no reason for it exists except hostility to the race and nationality to which petitioners belonged, and which in the eye of the law is not justified.' That imprisonment under an ordinance, the object of which was to drive out of business and prevent from exercising a legitimate and useful calling a number of persons, merely because they were Chinese, in the interest of competitors of another race, was illegal, presents a very different question from that involved in the present case; nor does the ruling that although the ordinance involved may have been fair and impartial in appearance, yet if it was administered by public authority with an evil eye and an unequal hand, so as practically to make illegal discriminations between persons in similar circumstances, material to their rights, imprisonment so brought about was illegal, control the present case. Here no business or useful occupation, established or to be established, was involved. The right of a man to ply his trade or business occupying property owned or rented by him, by which he serves the public and earns an honest livelihood, is very different from the alleged right contended for in this case, to hold meetings and make public speeches in the public streets of the city.

"The municipal authorities did not prohibit Prof. Fitts from speaking altogether, but prohibited him from holding public meetings and speaking in the public streets without a permit or consent, and he was convicted when he did so with the express purpose of violating the municipal ordinance and asserting an alleged right which he did not have. One who gathers a crowd in a public street under the invitation expressed in a hand-bill, announces an intention to violate and test a police regulation, mounts a box, and insists on speaking, though requested to desist by the authorities, can hardly claim to be in the same category with those who pursue lawful and useful occupations, and who desire to use property owned or rented by them in the conduct of their legitimate business. In Massachusetts v. Plaisted, 148 Mass. 375 (2 L. R. A. 142), a rule was passed by the board of police forbidding singing or playing or performing on instruments in the streets without the license of the board of police. A mem-

ber of the Salvation Army, playing on a musical instrument, contested the rule, and the case was carried to the Supreme Court. In the decision it was held that 'It is not an unconstitutional delegation of power for the legislature to authorize a city council to empower the city board of police to make rules and regulations with reference to itinerant musicians;' and that the constitutional right of freedom of worship did not prevent the adoption of reasonable rules for the use of the streets. In the case of City of Centralia *v.* Smith (Court of Appeals of Kansas), 77 S. W. 488, it was held that a city ordinance prohibiting the explosion of fire-crackers without the written consent of the mayor is within the police power of the city. 'A city ordinance prohibiting the explosion of fire-crackers without the written consent of the mayor is not void as a delegation of legislative power to the mayor.' . . Without discussing this fully, it may be said that, of course, if the statute itself were unconstitutional or the administration of the law were in excess of the authority or in violation of the constitution, the ruling might be otherwise. See also Kansas City *v.* Mastin, 9 Mun. Corp. Cases, 882, 68 S. W. 1037; Kennedy *v.* Mayor, 9 Mun. Corp. Cases, 871, 53 Atl. 317; Brodbine *v.* Revere, 10 Mun. Corp. Cases 452, 66 N. E. 607. There was nothing on the face of this ordinance to stamp it as unconstitutional. When a case of capricious, malicious, or arbitrary action arises, the courts will deal with it as the law requires; but I do not think that this is one of them. The answer of the mayor to the writ of certiorari shows that there was ample room for the legitimate exercise of discretion in refusing a permit to the plaintiff in certiorari; and the manner in which he proceeded to get up his crowd in the street, and the disorder which the answer of the mayor shows followed when the police sought to cause him to desist, indicate that there may have been good grounds for the way in which the discretion was exercised. While he may have been guilty of no actual acts of disorder himself, yet the gathering of the crowd in the street for the express purpose of violating the municipal ordinance, the practical dare to the municipal authorities to interfere with him, and the disorder occurring when they did so, as well as the other evidence in the case, indicate that the exercise of discretion on the part of the mayor and chairman of the board in refusing the permit

was not so arbitrary or capricious as to warrant a finding that either the ordinance or the administration of it was unconstitutional.

"In *Montross* v. *State*, 72 *Ga.* 261 (5th headnote), it is said: 'Every person is presumed to intend the natural and legal consequence of his conduct; and where the agent of a newspaper, knowing of the law of this State against circulating obscene literature, violated it for the express purpose of making a test case, or of vindicating the character of his paper, and, to insure a prosecution, sought the chief of police and gave him copies of the paper, he can not complain that he succeeded in obtaining a prosecution or that the court in its charge did him injustice as to the intent with which he committed the act, although the result of his experiment was different from that which he anticipated.' In the present case, not only were the hand-bills referred to scattered, but the plaintiff in certiorari gave written notice to the mayor of his intention to speak on the streets of Atlanta in spite of the fact that he had no permit or consent. I hold that no constitutional right of the plaintiff in certiorari was violated.

"There was no error in refusing the motion for a continuance, under the facts set out in the mayor's answer. Nor was there any error on the part of the mayor in holding that he was not disqualified to preside, under the statements in the answer. The ordinance was not void for any of the reasons assigned; nor was the sentence so excessive as to be illegal under the facts of the case. *Whitten* v. *State*, 47 *Ga.* 297. Nor does the answer of the mayor verify the statements of the plaintiff as to the sentence. [*Childs* v. *Moran*, 114 *Ga.* 320 (2).] The assignment of error in regard to the admission of evidence concerning the former speeches and conduct of the plaintiff in certiorari might be disregarded on the ground that it is too vague and general and lacking in specification. But if it be considered that he sought to attack the conduct of the mayor and chairman of the board of police commissioners on the ground that in denying him a permit they acted arbitrarily and capriciously, it was legitimate to show his previous conduct and language, and the circumstances under which the municipal authorities exercised the authority vested in them. Upon the whole case I am of opinion that the certiorari

should be overruled and the judgment of the mayor allowed to stand; and an order will be entered accordingly."

In our opinion, the reasoning and authorities cited in the foregoing opinion clearly establish the conclusions therein stated; and the certiorari was properly overruled.

*Judgment affirmed.   All the Justices concur.*