### 30345. FERGUSON v. CITY OF MOULTRIE.

DECIDED APRIL 8, 1944.

*Grover C. Powell,* for plaintiff in error.

*P. Q. Bryan, solicitor,* contra.

BROYLES, C. J. Jimmie Ferguson, a member of "Jehovah's Witnesses," was convicted in the recorder's court of the City of Moultrie of violating a certain ordinance of the city. His certiorari was overruled by the judge of the superior court, and that judgment is assigned as error in the present bill of exceptions.

The evidence authorized the recorder to find that the defendant had violated the ordinance. It is alleged, however, in the petition for certiorari that the ordinance is invalid and unconstitutional, if applied to the members of "Jehovah's Witnesses," since they are all ordained ministers of the Gospel, and the distribution by them of their magazines to people on the streets of towns and cities, and their acceptance of small sums of money therefor, are parts of their religious worship; that the restriction imposed by the ordinance on such activity is a violation of their rights of religious freedom as guaranteed by the constitution of the State of Georgia and the constitution of the United States. The City of Moultrie contends that the ordinance is a valid traffic regulation under the police power of the city; that the ordinance covers only the sidewalks of a small and congested area of the city used for commercial enterprises, and that the time designated in the ordinance (from 12 noon to 9 p. m. on Saturdays) is the period when the traffic, vehicular and pedestrian, reaches its highest peak in such area. The constitutional questions were raised during the trial in the re-

corder's court. The ordinance reads as follows: "Ordinance regulating selling on streets. Whereas the United States is now at war with the Axis Powers; and whereas the United States Government has erected adjacent to the City of Moultrie a $4,500,000 Advanced Air Base; and whereas the influx of mechanics and labor for the construction of said air base and the influx of soldiers and civilian personnel for the operation of said base has increased the population of the City of Moultrie approximately 33 1/3%; and whereas the auto traffic on the streets has practically doubled since war was declared, and the city has been forced to pass stringent ordinances to regulate the traffic and parking of cars on said street; and whereas the pedestrian traffic on the sidewalks in the business section of the City of Moultrie has practically doubled during the rush hours on each Saturday when the soldiers have their week-end leaves, and when the farmers come to town to shop; and whereas an emergency exists, and it is necessary, in order to keep the streets and sidewalks open for traffic during such rush hours that people may shop at the stores in the business section; and whereas the sale or the offering to sell of any goods, wares, or merchandise on the sidewalks causes pedestrian congestion and blocks the traffic so that people do not freely come and go along the sidewalks: Now, therefore, be it ordained by the mayor and city council of the City of Moultrie, that from and after the passage of this ordinance it shall be unlawful: Section 1. For any person, firm, or corporation to sell or offer for sale any goods, wares, merchandise, pamphlets, magazines, maps, or other article of value, on any Saturday between the hours of 12 noon and 9 p. m. on any of the following congested sidewalks of said city: 1. The sidewalks around the courthouse square. 2. The sidewalks on 1st Street S. E., between 1st Avenue South and 2d Avenue South. 3. The sidewalks on Main Street South between 1st Avenue South and Second Avenue South. 4. The sidewalks on Main Street North between Central Avenue and 1st Avenue North. Section 2. Be it further ordained by the authority aforesaid, that any person, firm, or corporation violating the terms of this ordinance shall be punished in accordance with section 6 of the City Code of 1935. Section 3. Be it further ordained by the authority aforesaid, that all ordinances and parts of ordinances in conflict herewith [be] and the same are hereby repealed."

This ordinance has been construed and passed upon in *Jones* v. *Moultrie,* 196 *Ga.* 526 (27 S. E. 2d, 39). The headnotes of that decision are as follows: "1. A municipal ordinance providing that it shall be illegal 'for any person, firm, or corporation to sell or offer for sale any goods, wares, merchandise, pamphlets, magazines, maps, or other article of value, on any Saturday between the hours of 12 noon and 9 p. m. on any of the following congested sidewalks of said city,' designating certain sidewalks and providing a penalty therefor, is a valid and reasonable regulation for public safety and convenience, under the police power of the city. 2. Where plaintiffs sought to enjoin enforcement against them of the ordinance, on the grounds that the magazines sold and offered for sale were devoted to religious subjects, and advocated the adoption of a particular form of religion, the distribution of which being a part of their religious belief, and urged that to prohibit the sale of the magazines would be in violation of their rights of religious freedom under the State and Federal constitutions, it was not error to deny an injunction."

In the body of the decision the court said: "The plaintiffs predicated their contentions upon the following provisions of the constitution of Georgia and the constitution of the United States: Article 1, section 1, paragraph 3 of the constitution (Code of 1933, § 2-103) : 'No person shall be deprived of life, liberty, or property, except by due process of law.' Article 1, section 1, paragraph 12 (§ 2-112) : 'All men have the natural and inalienable right to worship God, each according to the dictates of his own conscience, and no human authority should, in any case, control or interfere with such right of conscience.' Article 1, section 1, paragraph 13 (§ 2-113) : 'No inhabitant of this State shall be molested in person or property, or prohibited from holding any public office, or trust, on account of his religious opinions; but the right of liberty of conscience shall not be construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace and safety of the State.' Article 1, section 1, paragraph 15 (§ 2-115) : 'No law shall ever be passed to curtail, or restrain the liberty of speech, or of the press; any person may speak, write, and publish his sentiments, on all subjects, being responsible for the abuse of that liberty.'

18

"And the following from the constitution of the United States: First Amendment (Code of 1933, § 1-801): 'Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.' Fourteenth Amendment (§ 1-815): 'All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.'

"While the plaintiffs insist that they have been deprived of rights under each of the foregoing constitutional provisions, there is but one question here directly involved, and that is whether or not they have been denied rights of exercising religious freedom, under article 1, section 1, paragraph 12, of the constitution of the State of Georgia, or the first amendment to the constitution of the United States. The answer to this question necessarily controls their rights under the other provisions.

"Under our constitutional provisions, both State and Federal, the right to adopt, profess, entertain, or advocate any religious views, or to fail or refuse so to do, is unlimited, and cannot be controlled by any law. There is no authority under our system of jurisprudence to alter, modify, or infringe upon this right; as a person's sentiments and opinions upon this subject are controlled entirely by his own judgment and conscience. The courts will ever guard the right to a full and unlimited exercise of one's religious beliefs. The slightest encroachment upon this right would be but the beginning of a vanished liberty, and after death its grave would bear an epitaph recording its loss as due to the courts being recreant in their duty. While there is no power to control what a person may believe about religion or the type of religion he may adopt or profess, yet there is a power under the law to limit his acts, even though to do such acts may be part of his religious belief. The constitutional guarantee of the exercise of religious freedom does not extend to acts which are inimical to the peace,

good order, and morals of society. Under the claim of a religious privilege one could not practice promiscuous sexual intercourse, or offer up a human sacrifice, or practice public nudeness; because the laws of society, designated to secure its peace, prosperity, and the morals of its people are affected. All of the foregoing are plain and well recognized instances of curtailment of activities in furtherance of religious beliefs, and are so well implanted in the minds of our people that statutes prohibiting these acts may well be denominated as being based upon moral law. Yet limitations upon religious activities are not confined to instances where such acts are in contravention of moral law; as the right to exercise these activities ends where the rights of others begin. A person's right to exercise religious freedom, which may be manifested by acts, ceases where it overlaps and transgresses the rights of others. Every one's rights must be exercised with due regard to the rights of others. 'Sic utere tuo ut alienum non lædas' has been a maxim of legal application since the days of the civil law of the Roman Empire. To construe this constitutional right as being unlimited, and to hold as privileged any act if based upon religious belief, would be to make the professed doctrine of religious faith superior to the law of the land, and in effect would permit every citizen to become a law unto himself. No religious group could have the right to go upon the established church grounds of another religious sect where religious services were being conducted, and hold a meeting which would result in interfering with those whose right to its use was well established. Even though one might be actuated by his conscientious religious beliefs, and felt it his duty so to do, he could not go into one of our court-houses where court was in session, and carry on services that would interfere with the operation of the court. Nor could religious freedom extend to permitting one to carry on religious services during the rush hour at a congested corner of one of our large cities, which result in congestion and blocking of the traffic. Such limitations, though not based upon moral law, affect the rights of others, and are within the scope and control of the power of the State to regulate.

"Streets belong to the general as well as the local public; and if the control and general supervision of streets is conferred by the legislature upon the municipality, the municipality holds them in trust for the convenience and use of the public at large, and it be-

comes its duty to keep them in safe and suitable condition for the passage of persons and transportation of commodities. *Simon* v. *Atlanta,* 67 *Ga.* 618 (44 Am. Rep. 739) ; *City Council of Augusta* v. *Reynolds,* 122 *Ga.* 754 (50 S. E. 998, 69 L. R. A. 564, 106 Am. St. Rep. 147). 'A highway is a way open to all people.' *Southern Railway Co.* v. *Combs,* 124 *Ga.* 1004 (53 S. E. 508). 'A highway is a public way open and free to any one who has occasion to pass along it on foot or with any kind of vehicle.' *Atlanta & West Point R. Co.* v. *Atlanta B. & A. R. Co.,* 125 *Ga.* 529, 545 (54 S. E. 736). 'The streets of a city belong to the public, and are primarily for the use of the public in the ordinary way. . . The fact that the streets belong to the public does not authorize individuals to use them for all purposes. . . Their use for the purpose of gain is special and extraordinary, and may be prohibited or conditioned as the legislature or municipality deems proper. . . The use of streets and highways is not absolute and unrestricted. Such use is subject to reasonable regulation.' . . *Schlesinger* v. *Atlanta,* 161 *Ga.* 148 (129 S. E. 861) : 'The primary object of streets is for public passage. They should be kept open and unobstructed for that purpose. . . The streets of the city are peculiarly within the police control for the purpose of preserving and protecting their use by the public as thoroughfares.' *Fitts* v. *Atlanta,* 121 *Ga.* 567, 570 (49 S. E. 793, 67 L. R. A. 803, 104 Am. St. R. 167).

"The ordinance in question prohibits the sale of any article of value on certain designated sidewalks during a specified and limited period of each week. The ordinance is all-embracing as to the kinds of goods to be sold; it is narrowly limited to the sidewalks in a portion of the business area; and it is designed to cover a short period in each week when these sidewalks are used and needed most by the public.

"The population of Moultrie, the county site of Colquitt County, under the 1940 census is 10,147, and it appears that a military base is being constructed there, which, by reason of the presence of soldiers and construction workers, has increased the population by 33 1/3 per cent. We are inclined to think of traffic and pedestrian congestion only as applied to larger cities. But those who are acquainted with traffic conditions in communities the size of Moultrie know that on Saturday afternoons such communities have their

own peculiar traffic problems. Saturday is the workers' holiday. It is the universal custom for the farmer, the industrial worker, the laborer, and for most others not connected with some form of mercantile establishment to meet and assemble within such communities. While such gatherings are primarily based upon commercial needs, it is not so confined, as families are brought along, and the gathering assumes, in a degree, a social aspect. In so far as the vehicle traffic is concerned, while probably not as numerous as will be found on the congested streets of a large city, it is carried on by drivers less experienced in traffic problems; but the pedestrian traffic, though it may move slowly, is generally equivalent to the busy corners of a large city, and presents in like manner serious problems in public safety.

"This ordinance with its general application to the sale of all articles without any discrimination, and its limited scope as to territory and time, is not unreasonable, but is a valid regulation under the police power for public safety and convenience. It is entirely different in principle from the ordinance construed in Lovell *v.* Griffin, 303 U. S. 444 (58 Sup. Ct. 666, 82 L. ed. 949), as it includes none of the objectionable features of the Griffin ordinance, which required a permit from the city manager before any kind of literature could be distributed free, or by sale, at any place within the city, at any time. In holding the Griffin ordinance invalid, the court said: 'There is thus no restriction in its application with respect to time or place. It is not limited to ways which might be regarded as inconsistent with the maintenance of public order, or as involving disorderly conduct, the molestation of the inhabitants, or the misuse or littering of the streets. The ordinance prohibits the distribution of literature of any kind at any time, at any place, and in any manner without a permit from the city manager.' Neither is the construction in the instant case contrary to any ruling in Murdock *v.* Pennsylvania, 319 U. S. 105 (63 Sup. Ct. 870, 87 L. ed. 1292), or Martin *v.* Struthers, 319 U. S. 141 (63 Sup. Ct. 862, 87 L. ed. 1313 [146 A. L. R. 81]). In the Murdock case the ordinance which the court ruled invalid required a license fee to sell any article (except samples to manufacturers or licensed dealers) upon the streets. The gist of the ruling in the Murdock case was, that the activities of the parties being religious: 'The privilege in question exists apart from State au-

thority. It is guaranteed the people by the Federal constitution.' But the decision carefully points out that the ruling there made has a limitation, as it states: 'Nor do we have here, as we did in Cox v. New Hampshire [312 U. S. 569, 61 Sup. Ct. 762, 85 L. ed. 1049, 133 A. L. R. 1396], and Chaplinsky v. New Hampshire [315 U. S. 568, 62 Sup. Ct. 766, 86 L. ed. 1031], State regulation of the streets to protect and insure the safety, comfort, or convenience of the public.' In the Struthers case the ordinance held invalid forbade 'any person distributing handbills, circulars, or other advertisements to ring the door-bell, sound the door-knocker, or otherwise summon the inmate or inmates . . to the door.' While no question of a license was involved, the ordinance was not limited to any particular time or place, and was limited to circulars, handbills, or other advertisements.

"Nor is anything contained in the foregoing ruling in conflict with other decisions of the United States Supreme Court, to wit: Cantwell v. Connecticut, 310 U. S. 296 (60 Sup. Ct. 900, 84 L. ed. 1213, 128 A. L. R. 1352) ; Schneider v. State (Town of Irvington, New Jersey), 308 U. S. 147 (60 Sup. Ct. 146, 84 L. ed. 155) ; Largent v. Texas, 318 U. S. 418 (63 Sup. Ct. 667, 87 L. ed. 873) ; Jamison v. Texas, 318 U. S. 413 (63 Sup. Ct. 669, 87 L. ed. 869). Nor is anything herein contrary to the dissenting opinion in Jones v. Opelika, 316 U. S. 584 (62 Sup. Ct. 1231, 86 L. ed. 1691, 141 A. L. R. 514), which was overruled and the judgment vacated in Murdock v. Pennsylvania, supra, and the dissenting opinion adopted as controlling the case. In each of the above cases, where city ordinances were declared invalid, the ordinance either contained a provision for the distributor to procure a license or approval by some one, or else was unlimited as to area and time of the application of the ordinance. None of the above cases, and no case therein cited and relied on, contained any prohibition upon the municipality regulating the time, places, and manner of using its streets in the interest of public safety, where it is general nondiscriminatory legislation unhampered by the arbitrary will of any one."

The foregoing decision of the Supreme Court, holding that the ordinance in question is valid and enforceable against members of "Jehovah's Witnesses," is binding on this court. It follows that the overruling of the certiorari was not error.

*Judgment affirmed. MacIntyre and Gardner, JJ., concur.*