COMMITTEE FOR INDUSTRIAL ORGAN-
IZATION et al. v. HAGUE, Mayor,
et al. *

District Court, D. New Jersey.
Oct. 27, 1938.

*Decree modified 101 F.2d 774; writ of certiorari granted 59 S.Ct. 486, 83 L.Ed. ——.

Spaulding Frazer, of Newark, N. J. (David Stoffer, of Newark, N. J., Morris L. Ernst, Lee Pressman, Benjamin Kaplan, and Harriet F. Pilpel, all of New York City, of counsel), for plaintiffs.

James A. Hamill, of Jersey City, N. J. (John A. Matthews, of Newark, N. J., and Charles Hershenstein, Edward J. O'Mara, Joseph C. Glavin, and Charles A. Rooney, all of Jersey City, N. J., of counsel), for defendants.

CLARK, District Judge.

This case seeks the solution of a problem inevitable and inherent in a democratic form of government. Upon its sound solution the preservation of that form of government may well be said to depend. For that reason we repeat the hope, expressed at the trial, that this opinion will prove only an indistinct sign-post on the road to the ultimate wisdom of the highest tribunal. We spoke of seeking a solution advisedly. We are going to assume, or should we say presume, that both parties to the litigation are convinced that their opposing points of view are in the interest of that democracy we are sure both believe in. Any contrary assumption, or presumption, depends for its validity upon psychological factors difficult of determination and of no help in arriving at a conclusion. So we disregard the spasmodic spirit evinced by such respective trial amenities as "tin-pot Hitler" and "busybodies" (as the merchant said of the fire engines). As in many matters of political science there exists a necessity for balance and a consequent inability to agree as to the proper adjustment of the scales. The committee which prepared the learned and interesting discussions in anticipation of the recently held convention for revision of the New York Constitution puts it thus:

"Quite apart from the previous considerations, there is an inherent difficulty in defining the proper scope of freedom to speak, to publish and to assemble. The difficulty arises from the fact that speech, publication and assembly of some sorts, occurring under some circumstances may lead to undesirable consequences. These consequences may be sufficiently undesirable and the probability that they will occur sufficiently high to justify action by the State which is addressed to preventing the speech, publication or assembly which creates such danger." 151, "* * * The difficulty lies in the multiple variations that may occur between the extremes." 152. Vol. 6, Problems Relating to Bill of Rights and General Welfare, New York State Constitutional Convention Committee, 1938.

And similarly Professor Chafee, Freedom of Speech and Eliel Freedom of Speech During and Since the Civil War, 18 American Political Science Review, 712:

"The true meaning of freedom of speech seems to be this. One of the most important purposes of society and government is the discovery and spread of truth on subjects of general concern. This is possible only through absolutely unlimited discussion, for, as Bagehot points out, once force is thrown into the argument, it becomes a matter of chance whether it is thrown on the false side or the true, and truth loses all its natural advantage in the contest. Nevertheless, there are other purposes of government, such as order, the training of the young, protection against external aggression. Unlimited discussion sometimes interferes with these purposes, which must then be balanced against freedom of speech, but freedom of speech ought to weigh very heavily in the scale. The First Amendment gives binding force to this principle of political wisdom." Chafee, p. 34.

"There is also a social interest in free speech as a guarantee of political efficiency and an instrument of progress; and this social interest must be balanced against the social interests in repression. * * * Another doctrine for the interpretation of the use abuse-theory, the test of clear and immediate danger is suggested in determining which, not only the words uttered, but the situation in which they are uttered must be considered. * * * Only the emergency that makes it immediately dangerous to leave the correction of evil counsels to time warrants making any exception to the sweeping command." Eliel, p. 734–735.

We think the mere statement of the question acquits our opening sentences of pompousness or exaggeration. The City of Jersey City, through its appropriate elective officials the Mayor and Commissioner of Public Safety, has adopted a deliberate policy. It has not been necessary to seek for proof of that policy in the usual unsatisfactory process of weighing the conflicting testimony of witnesses or in the even more unsatisfactory study of counsel's conflicting interpretations of that testimony. In fact, the only exception to this pleasant posture of the litigation lies in the

rather unsuccessful attempts of counsel to cut the cloth of some of that testimony to their conception of the law. We say this with a full appreciation of the difficulty inherent in reconciling the views of a positive city official with the pronouncements of a powerful Supreme Court.

That deliberate policy of Jersey City is this. Certain individuals and groups of individuals (whether incorporated or not), the plaintiffs in this case, are alleged to be the kind of persons and to hold the kind of opinions to which the people of Jersey City or a majority of them are, to use a current and expressive medical term—allergic. In the practice of preventive medicine, so to speak, these individuals and groups are not permitted to come in contact with the body (politic) in which they produce the undesirable symptoms of "riot, disturbance and disorderly assemblage" (the words of the contested ordinance). In two particulars this medical metaphor breaks down. The effect of mustard, let us say, upon the human body lies in the field of physiology, an exact science, and is certain. Mustard is not protected by the Constitution. The effect of opinion upon the human mind lies in the field of psychology, not an exact science and is not certain. Opinion is protected by the Constitution. That breakdown or difference precludes the accurate answer implicit in all exact science and requires the writing of this opinion.

An analysis of the prescription of Drs. Hague (the Mayor) and Casey (The Commissioner of Public Safety) indicates five ingredients (not necessarily in equal parts, for one at least telescopes the rest). The individuals or groups diagnosed as giving rise to the alarming symptoms aforesaid are not allowed to (1) be in Jersey City, (2) express their opinions in Jersey City either to (a) those who signify their willingness to receive them by (1) accepting circulars or (2) going to privately owned meeting places or (b) those who receive them involuntarily (1) in the form of speeches made in public places or (2) placards displayed on public streets.

To turn from medicine to law: The City of Jersey City has prevented these plaintiffs, both singly and in groups, from being, moving about, and communicating their thoughts within the city limits. Do they have legally enforceable rights corresponding to these human powers? If they have such rights, what is their extent? Has the action of the defendants impinged upon that extent? Since this democracy happens to be cast in the Federal mold, our answer to these questions must be sought in some clause or clauses of a written constitution.

That there are such corresponding rights and, of course, their complimentary liberties is conceded. So in nearly all modern legal systems we find a right (or liberty) of locomotion (movement) of free speech (and press) and of free assembly. Whether these liberties should be called natural or civil has been the subject of theoretical discussion. Professor Lieber in his book entitled Civil Liberty and Self-Government gives us this definition: "Civil liberty is the idea of liberty in connection with politics, and must necessarily partake of the character of, or intertwine itself with, the whole system of politics of a given nation." Chap. 3, The Meaning of Civil Liberty, at p. 42.

The matter seems rather one of scholarly description than of constitutional significance and we may, therefore, agree with Ambassador Bryce that it is: "Enough to say that although the conception of Individual Liberty may be made to include the exemptions our ancestors contended for in the seventeenth century, and though every kind of individual liberty may be called a Civil Liberty, there is this significant difference that the Civil liberties of those older days were extorted from arbitrary monarchs, whereas what we call Individual Liberty today has to be defended, when and so far as it needs defence, against the constitutional action of a self-governing community." Modern Democracies, at p. 63. And see, also, Modern Political Constitutions, Strong, p. 34; Our Ineffective State, Hessler, p. 21; The Story of Civil Liberty in the United States, Whipple; Political Theories from Rousseau to Spencer, Dunning, p. 118.

As our particular legal system depends upon a rigid constitution, we are faced at once with its Pythias, interpretation. Mr. Justice Story pointed with pride to the fact that constitutions spoke in general terms, quoting Chief Justice Marshall in the case of Martin v. Hunter, 1 Wheat. 304, 326, 327, 4 L.Ed. 97: "The Constitution unavoidably deals in general language. It did not suit the purposes of the people, in framing this great charter of our liber-

ties to provide for minute specifications * * *." Story's Commentaries, Vol. 1, 5th Ed. p. 323.

Any examination of Federal Constitutions generally demonstrates that their particularity increases in inverse proportion to their age. Real Democracy in Operation, Felix Bonjour (Swiss); Canada's Federal System, A. H. F. Lefroy; The Law of the Australian Constitution, Donald Kerr; The Law and Custom of the South African Constitution, Kennedy and Schlosberg; Government of India Act, 1935, 26 Geo. 5, Ch. 2; Federations, A Study in Comparative Politics, D. G. Karve; India, A Federation, Sir Frederick Whyte, K.C.S.I.; La Constitution de la Republique Argentine, E. Rouys; American Constitutions, A compilation of the Political Constitutions of the Independent Nations of the New World, Rodriquez (International Bureau of the American Republics, Vol. 2, July 1905). The historical fact seems to be that Mr. Justice Story's vaunted vagueness was due rather to a distrust for any constitution than to a scientific preference for indefiniteness. Whatever the merits of the two schools of constitutional draftsmanship it is plain that the learned justice places a greater burden, or should we say benefit, of governance upon the interpreting agency.

The constitutional provisions here applicable are contained in the First and Fourteenth Amendments, U.S.C.A.Const. Amends. 1, 14, and the pertinent words are liberty, due process and free as applied to speech and assembly. Can one conceive of words more flexible in content and in more complete fulfillment of Mr. Justice Story's ideal? Their very pliability is in fact the reason for our current capacity. The Supreme Court has recently adopted the dissent of Mr. Justice Harlan in Patterson v. Colorado, 205 U.S. 454, 27 S.Ct. 556, 51 L.Ed. 879, 10 Ann.Cas. 689, and has declared that freedom of speech and assembly come within the meaning of liberty as used in the Fourteenth Amendment. Gitlow v. New York, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138; Whitney v. California, 274 U. S. 357, 47 S.Ct. 641, 71 L.Ed. 1095; Burns v. U. S., 274 U.S. 328, 47 S.Ct. 650, 71 L. Ed. 1077; Stromberg v. California, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117, 73 A.L.R. 1484; Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357; Grosjean v. American Press Co., 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660, and are therefore protected against action by the states (or their agencies as here). This is a direct reversal of a doctrine, expounded in the cases from Barron v. Baltimore, 1833, 7 Pet. 243, 8 L.Ed. 672, where Chief Justice Marshall referred to the "extraordinary occupation of improving the constitutions of the several states" [page 250] to Prudential Insurance Co. v. Cheek, 1922, 259 U.S. 530, 42 S.Ct. 516, 66 L.Ed. 1044, 27 A. L.R. 27. It is not our place to comment and much less to criticize. Those who are interested are referred to the articles of Judge Shattuck and Mr. Warren, The True Meaning of the Term "Liberty" In Those Clauses in the Federal and State Constitutions Which Protect "Life, Liberty and Property", 4 Harvard Law Review, 365 (Shattuck), The New "Liberty" Under the Fourteenth Amendment, 39 Harvard Law Review 431 (Warren) and see Bill of Rights and Fourteenth Amendment, 31 Columbia Law Review 468, Constitutional Law: Liberty of Assembly Under the Fourteenth Amendment, 25 California Law Review 496. In any event this change of position on the part of the Supreme Court is indicative of the elastic character of the interpretative function and perhaps also of our favorite theory that rigid constitutions must be construed in the light of political science.

The words "liberty" and "free" are absolute in grammatical form. Are they absolute in constitutional or for that matter in any other interpretation? Mr. Lippman thinks not: "There are, so far as I can discover no absolutists of liberty; I can recall no doctrine of liberty which under the acid test does not become contingent upon some other ideal. * * * For what every theorist of liberty has meant is that certain types of behaviour and classes of opinion better regulated should be somewhat differently regulated in the future." 124 Atlantic Monthly 616 quoted in 21 Columbia Law Review 526 at 529.

If they are not absolute but conditional how must we determine the conditions: In part certainly from the history and philosophy of the concepts for which they stand. To attempt any extended exposition of either would enlarge this opinion beyond any reasonable limits and be an impertinence to those better qualified than this court. In the case of "liberty" it would be a word of supererogation because the meaning applicable to the case at bar is not in dispute. That meaning is an acknowledgment of a right of locomotion and a

consequent right to freedom from restraint of the person except as a result of due legal process. It may not be amiss, however, to give some brief attention to the history and philosophy of the more controversial word free as applied to speech and assembly.

As the history of free speech is the outgrowth of its philosophy the latter takes precedence. Furthermore it can best be gathered from wiser and more eloquent pens. We are arranging the quotations under headings that seem to us appropriate to the logic of the thesis. A fortiori we have included excerpts indicating dissent.

A. From the point of view of the persons expressing the thought—

I. The instinct for the expression of thought in human beings is as inevitable as the thought process itself:

" * * * nam nec peritissimi, ne dicam plebem, tacere sciunt. Hoc hominum commune vitium est, consilia sua, etsi tacito opus est, aliis credere." Spinoza. Translation: "Not even the wisest can hold their tongues and it is a universal vice of men to tell their ideas to others even when silence is needful."

"For as long as human beings have tongues and minds they will say what they think and they will think differently." Freedom of Speech During and Since The Civil War, 18 American Political Science Review 712 (Eliel), above cited.

"Force in matters of opinion can do no good, but is very apt to do hurt, for no man can change his opinion when he will, or be satisfied in his reason that his opinion is false because discountenanced." Rev. Jeremy Taylor.

"The power of communicating thoughts and opinions is the gift of God, and the freedom of it is the source of all science, the first fruits and the ultimate happiness of society; and therefore it seems to follow that human laws ought not to interpose, nay, cannot interpose, to prevent the communication of sentiments and opinions in voluntary assemblies of men." Lord Chief Justice Eyre.

"Man has a right to think all things, speak all things, write all things, but not to impose his opinions." Machiavelli.

"It is not the law that is to be found in books that constitutes—that has constituted, the true principle of freedom in any country at any time. No, it is the energy, the boldness of a man's mind which prompts him to speak not in private, but in large and popular assemblies, that constitutes, that creates in a state the spirit of freedom. This is the principle that gives life to liberty; without it the human character is a stranger to freedom." Rt. Hon. C. J. Fox.

II. So to repress it is dangerous:

"Finally the most efficient of means for the preservation of the state from revolution is that which is in general the least considered—a system of education in the spirit of the constitution." Aristotle.

"Since, therefore, no one can abdicate his freedom of judgment and feeling; since every man is by indefeasible natural right the master of his own thoughts, it follows that men thinking in diverse and contradictory fashions cannot, without disastrous results, be compelled to speak only according to the dictates of the supreme power." Spinoza.

"But there is one only thing which gathers people into seditious commotions, and that is oppression.

"There is a remedy at hand, better than force, if you and your friends will use it, which cannot but prevail; and that is, let the ministers of truth be as diligent; and they bringing truth with them, truth obvious and easy to understand, as you say what is necessary to salvation is, cannot but prevail." John Locke.

"The press must be free; it has always been so and much evil has been corrected by it. If Government finds itself annoyed by it, let it examine its own conduct and it will find the cause—let it amend it and it will find the remedy." Thomas Lord Erskine.

But see contra:

"We lawyers, who have seen the unreliability of evidence, know the truth about truth, which is that, unsupported by the sanction of Authority, it is as little conducive to public order as a lie. To the ignorant and brawling fanatics who stir you with their pother about liberty, political or civil liberty seems to be the principal end for which government ought to exist, instead of the furtherance of the commonwealth to the greatest extent." Austin.

"Democracies which have gone fascist have gravely sinned by their leniency, or by too legalistic concepts of the freedom of public opinion. Slowly, the remaining democracies are remedying the defect. In some instances, the criminal codes are reformed in order to cope with the misuse of the press and of free speech to

foster subversive propaganda or recriminations which affect the dignity of the republican and democratic institutions." Militant Democracy and Fundamental Rights, by Karl Loewenstein, 31 American Political Science Review, 417, 638, at 652.

III. And to permit it salutary:

"The only security of all is a free press. The force of public opinion can not be resisted when permitted freely to be expressed. The agitation it produces must be submitted to. It keeps the waters pure." Thomas Jefferson.

"With effervescing opinions as with not yet forgotten champagnes, the quickest way to let them get flat is to let them get exposed to the air." Mr. Justice Holmes, letter to a friend, January, 1921.

"We have learned considerable from the affair and I might say that the lesson briefly is this: Street speaking should be allowed as far as possible, where it does not absolutely interfere with traffic, so as to give to an agitator the right to give vent to his feelings if he desires. It is safer to let him talk than to shut him up." Freedom of Assemblage and Public Security, Brooks, Vol. 9, Publications of the American Sociological Society pp. 11, 12.

"Pent-up volcanoes destroy far and wide when they burst their barriers, but the open crater pointed heavenward furnishes an excellent safety valve for hidden fires. Suppress social discontent, and riots follow; but allow men through their natural leaders to speak their grievances freely, through press and platform, and the very expression of them relieves the situation and becomes a method of education. We of the twentieth century are as yet such babes in knowledge, that we might far better furnish free forums at public expense, to any man or set of men who believe they have some new thing under the sun to talk about." Discussion by J. Q. Dealey, Brown University, Vol. 9, Proceedings of the American Sociological Society, p. 42 at p. 43.

B. From the point of view of the thoughts expressed—

I. Truth is not absolute:

"And though all the winds of doctrine were let loose to play upon the earth, so Truth be in the field, we do injuriously by licensing and prohibiting to misdoubt her strength. Let her and Falsehood grapple; who ever knew Truth put to the worse, in a free and open encounter?" John Milton.

"The opinion which it is attempted to suppress by authority may possibly be true. Those who desire to suppress it, of course deny its truth; but they are not infallible. They have no authority to decide the question for all mankind, and exclude every other person from the means of judging. To refuse a hearing to an opinion, because they are sure that it is false, is to assume that their certainty is the same thing as absolute certainty. All silencing of discussion is an assumption of infallibility. Its condemnation may be allowed to rest on this common argument, not the worse for being common." John Stuart Mill.

"Evidently such proposals to limit the right of free speech, political or religious, can be defended only by making the tacit assumption that whatever political or religious beliefs are at the time established, are wholly true; and since this tacit assumption has throughout the past proved to be habitually erroneous, regard for experience may reasonably prevent us from assuming that the current beliefs are wholly true. We must recognize free speech as still being the agency by which error is to be dissipated, and cannot without papal assumption interdict it." Herbert Spencer.

"If persecution is unnecessary in the defense of truth, it has a fearful efficacy in preventing men from discovering it; and when it is so employed, as infallibility does not exist among mankind, no man can assuredly decide. For truth is scattered far and wide in small portions among mankind, mingled in every system with the dross of error, grasped perfectly by no one, and only in some degree discovered by the careful comparison and collation of opposing systems." W. H. H. Lecky.

"He that will not reason is a bigot; he that cannot reason is a fool; he that dares not reason is a slave." Sir William Drummond.

"If there is anything in the universe that can't stand discussion, let it crack." Wendell Phillips.

"The man who will not investigate both sides of a question is dishonest." Abraham Lincoln.

"To court discussion, is, of course, no certain proof that we are right, but to be afraid of it, is conclusive indication that

we suspect at least we may be wrong." Abraham Lincoln.

But see contra: "There is nothing so true and good that skilful talkers cannot make it appear doubtful." Bodin.

II. The heterodoxy or minority of today is the orthodoxy or majority of tomorrow:

"When there are persons to be found who form an exception to the apparent unanimity of the world on any subject, even if the world is in the right, it is always probable that dissentients have something worth hearing to say for themselves, and that truth would lose something by their silence." John Stuart Mill.

"In his person though he were the worst of men I contend for safety and security". Chatham.

"The community which dares not protect its humblest and most hated member in the free utterance of his opinions, no matter how false or hateful, is only a gang of slaves." Wendell Phillips.

"But the consideration which has the most enduring weight is the weakness of our capacity for truth. So much is doubtful, so much is altogether unknown; so indolent, so timid, so careless of truth, are the mass of men; so ill-situated and so ill-provided for knowing what is true are the rulers of every state, that the public cannot be too wary in committing to a government, a government cannot be too lenient in exercising any control over the expression and diffusion of ideas. And what holds good of governments, holds good also, although in a less degree, of public opinion.

\* \* \* \* \* \*

"And as it is with the reformer, so is it with the public whom he addresses. They may dislike his projects, they may suspect his motives, but they must debate the case upon its merits. For they too must confess that out of the numberless heresies of the past their present orthodoxy has arisen. They see that their own orthodoxy was once an innovation and may come to be a relic. It is but a relative orthodoxy. It too will pass, and they cannot say for certain what will succeed it. Thus ·forced to abandon dogmatism, they must be content to cling to honesty of purpose and scientific method." Montague.

"One danger—the smaller one—yet sometimes troublesome, is the difficulty of ascertaining the will of the majority. The other danger is that minorities may not sufficiently assert themselves. Where a majority has erred, the only remedy against the prolongation or repetition of its error is in the continued protests and agitation of the minority, an agitation which ought to be peaceably conducted, carried on by voice and pen, but which must be vehement enough to arouse the people and deliver them from the consequences of their blunders." James Bryce.

III. This is particularly so in the field of political science because of—

(a) The nature of the subject matter:

"No good ·government has anything to fear from paper shot." Oliver Cromwell.

"So true it is, however, that the discontent of the people is the only means of removing the defects of vicious governments, that the freedom of the press, the main instrument of creating discontent, is, in all civilized countries, among all but the advocates of misgovernment, regarded as an indispensable security, and the greatest safeguard of the interests of mankind." James Mill.

"It is the ancient and constitutional right of this people to canvass public measures, and the merits of public men. It is a homebred right, a fireside privilege. \* \* It is not to be drawn into controversy. It is as undoubted as the right of breathing the air and walking on the earth. Belonging to private life as a right, it belongs to public life as a duty. This high constitutional privilege, I shall defend and exercise in all places in time of war, in time of peace and at all times. Living, I will assert it." Daniel Webster.

"The last right we shall mention regards the freedom of the press. The importance of this consists, besides the advancement of truth, science, morality and arts in general, in its diffusion of liberal sentiments on the administration of government, its ready communication of thoughts between subjects, and its consequential promotion of union among them, whereby oppressive officers are shamed or intimidated into more honorable and just modes of conducting affairs." The Continental Congress of 1774.

But see contra:

"First, the exercise of final judgment as to the expression of opinions and doctrines. So prolific in discord is freedom of expression that the great end of civil life is ever in peril without a strict supervision of speech and writing by the supreme authority. This is Hobbes's concise reply

to the Miltonic plea for unlicensed printing." Bodin.

"Curbing the speech of the governed is one of the first measures of a government when it is ever so slightly alarmed, and except in ancient Athens no one has ventured to suggest that it is not a legitimate exercise of power." Freedom of Speech in Ancient Athens, Max Radin, Vol. XLVIII, American Journal of Philology, at p. 215.

(1) And more especially where the specimen of that subject matter happens to be a democracy:

"The sun might as easily be spared from the universe as free speech from the liberal institutions of society." Socrates.

"If there be any among us who would wish to dissolve this Union or to change its republican form, let them stand undisturbed as monuments of the safety with which error of opinion may be tolerated where reason is left free to combat it." Thomas Jefferson.

"Freedom of opinion, of speech, and of the press is our most valuable privilege, the very soul of republican institutions, the safeguard of all other rights. * * * Nothing awakens and improves men so much as free communications of thoughts and feelings.

"If men abandon the right of free discussion; if, awed by threats, they suppress their convictions; if rulers succeed in silencing every voice but that which approves them; if nothing reaches the people but what would lend support to men in power— farewell to liberty. The form of a free government may remain, but the life, the soul, the substance is fled." William Ellery Channing.

"Repression of full and free discussion is dangerous in any government resting upon the will of the people. The people cannot fail to believe that they are deprived of rights, and will be certain to become discontented when their discussion of public measures is sought to be circumscribed by the judgment of others upon their temperance or fairness." Cooley.

"The theory of government requiring royalty to be invested with perfection, which forbids question or discussion, is diametrically opposed to our theory of popular government in which the utmost latitude and freedom in the discussion of business affecting the public and the conduct of those who fill positions of public trust, that is consistent with truth and decency is not only allowable but essential to the public welfare." Storey v. People, 79 Ill. 45, at page 51, 52, 22 Am.Rep. 158, Scholfield, J.

"The very idea of a government, republican in form, implies a right on the part of its citizens to meet peaceably for consultation in respect to public affairs and to petition for a redress of grievances." Mr. Chief Justice Waite, in U. S. v. Cruikshank, 92 U.S. 542, at page 552, 23 L.Ed. 588.

"The greater the importance of safeguarding the community from incitements to the overthrow of our institutions by force and violence, the more imperative is the need to preserve inviolate the constitutional rights of free speech, free press and free assembly in order to maintain the opportunity for free political discussion, to the end that government may be responsive to the will of the people and that changes, if desired, may be obtained by peaceful means. Therein lies the security of the Republic, the very foundation of constitutional government." Mr. Chief Justice Hughes in De Jonge v. Oregon, 299 U.S. 353, at page 365, 57 S.Ct. 255, at page 260, 81 L.Ed. 278.

(b) The unavoidably biased character of its judge (the censor):

"In other words, printing and speaking are to be subject to general rules of law, not to administrative censorship or arbitrary legislative restriction." Equitable Relief Against Defamation and Injuries to Personality, Roscoe Pound, 29 Harvard Law Review 640, 651.

"that to suffer the civil magistrate to intrude his powers into the field of opinion, and to restrain the profession or propagation of principles on supposition of their ill tendency, is a dangerous fallacy." Thomas Jefferson.

(c) Because of an obvious distinction between thought and action, words and deeds:

"that it is time enough for the rightful purposes of civil government for its officers to interfere when principles break out into overt acts against peace and good order." Thomas Jefferson.

"The true distinction (between persecution and punishment) is perfectly obvious. To punish a man because he has committed a crime, or is believed, though unjustly, to have committed a crime, is not persecution. To punish a man be-

cause we infer from the nature of some doctrine which he holds, or from the conduct of other persons who hold the same doctrines with him, that he will commit a crime, is persecution; and is, in every case, foolish and wicked." Lord Macaulay.

"silly leaflet of an unknown man." Mr. Justice Holmes, dissenting opinion in Abrams v. United States, 250 U.S. 616, at page 628, 40 S.Ct. 17, at page 21,. 63 L.Ed. 1173.

"It is the essence of the institutions of liberty that it be recognized that guilt is personal and cannot be attributed to the holding of opinion or to mere intent in the absence of overt acts." Charles Evans Hughes on the ouster of the Socialist assemblyman, at Albany, New York, January, 1920.

"Our state rests too firmly upon the devotion of its citizens to require for its protection an imprisonment of five years for the mere expression of an erroneous, or even an illegal, political doctrine, unaccompanied by an overt act." Governor Alfred E. Smith.

Anything more than an outline of the history of free speech would be a pedantic display of very easily obtainable knowledge. The standard authorities in the Anglo-Saxon countries are in England, Liberty of the Press, Speech and Public Worship, Paterson; in the United States, Constitutional Free Speech, Schroeder; Freedom of Speech, Chafee; The Inquiring Mind, Chafee (the law review article quoted at some length by the learned Supreme Court of New Jersey in a recently filed opinion [1] is to be found in Chapter 1 of Freedom of Speech, Chafee); Law of American Constitution, Chap. 13, Freedom of Religion, Press & Assembly, Burdick; The Reference Shelf, Vol. 4, Civil Liberty, Edith M. Phelps, No. 9; Freedom of the Press, Dawson; Censorship of Speech and the Press, Beman; Essays on Jurisprudence and Ethics, Sir Frederick Pollock, Chapter six, The Theory of Persecution; Proceedings of the American Sociological Society, Vol. 9, p. 67, Schofield. There are in addition a galaxy of articles in legal periodicals, the best of which in our judgment are found in: Freedom of Speech and of the Press, 2 Minn.Law Review 239; Does the Constitution Protect Free Speech, 19 Mich.Law Review 487; Power of Government Over Free Speech and the Press, 29 Yale Law Journal 410; Free Speech in War Time, 21 Columbia Law Review 526; The Courts and Free Speech, 8 Ill. Law Review 141; Freedom of Speech and the Press, 30 Yale Law Journal 48; Free Trade in Ideas, 11 Journal of the American Institute of Criminal Law and Criminology, 181; Freedom of Speech and the Espionage Act, 55 American Law Review 695; Freedom of Speech and of the Press in the Federal Period, Sedition Act, 18 Michigan Law Review 615; Freedom of Speech and of the Press, 4 Indiana Law Journal 445; Freedom of Speech During and Since the Civil War, above cited; Freedom of Speech and the Press, 21 Georgetown Law Journal 35, 161.

To summarize their very thorough expositions: The problem of free speech became acute, as might be expected with the invention of and perfection of the printing press. At first as part of its policy of control over monopolies, the Crown made this new art subject to license. The advantage of such control by license as the handmaid of tyranny soon became apparent. Although not considered a liberty essential enough to be included in the Petition of Right (1628) or the Grand Remonstrance (1641), the struggle to free the printing press finally became part of the contest of the people against the Crown. This battle included, of course, a simultaneous resistance to another way of accomplishing prevention, namely, repression. So we find the agitation against the laws of seditious libel, the letters of Junius, the trial of the Printer and "that devil Wilkes". The first controversy ended in the victory expressed in Blackstone's pronouncement about previous restraints. Blackstone's Commentaries, Vol. 4, Chapter 2, p. 151. He raised freedom of press from a literary and political watchword to an accepted legal concept. Freedom of Speech and the Press, 30 Yale Law Journal (Corwin) 49.) The second in a transference of adjudication from the King's Judges (whether in the Star Chamber or Lord Mansfield in open court) to the "people's shopkeepers". See Law of the Constitution 4th Edition 234, Dicey. There has been much discussion as to the substance of any distinction between previous restraint and subsequent punishment. Freedom of Speech, Chafee, above cited (Chap. 2, Opposition to the War With Germany); Freedom of Speech and the Press, 21 Georgetown Law Journal 35, 161, above cited; Does the Constitution Protect Free Speech, 19 Michigan Law Review 487,

[1] Thomas v. Casey (N.J.Sup.) 1 A.2d 866.

above cited; Power of Government Over Free Speech and the Press, 29 Yale Law Journal 410, above cited; Constitutional Free Speech, Schroeder, above cited (Blackstone's Critics, Chapter 2); Freedom of Speech During and Since the Civil War, Eliel, above cited; Section 2 of Chapter 12, Vol. 6, Problems Relating to Bill of Rights and General Welfare, New York State Constitutional Convention Committee, above cited. There is at least this difference. Advance action forestalls the opportunity for martyrdom.

The United States came into being almost simultaneously with the outcome of the struggle we have been talking about. The Colonies had had a similar history of repression at the hands of the Royal Governors: "There are no free schools or printing and I hope we shall not have these 100 years hence, for learning has brought disobedience and heresy and sects into this world and printing has divulged them. Libels against the best government have resulted. God keep us from both." Governor Berkely, Watson Const. Vol. 2, p. 1400; Development of Freedom of the Press in Massachusetts, Dunniway; Constitutional Free Speech, Schroeder, particularly Chapters 5 and 7.

One might therefore expect to find some countervailing provision in the Constitution. One was submitted, but here we come across that fear of the central government which is both the reason for and the handicap of Federations (Le Fur's Etat Federal, Le Fur, Les Etats Federeaux-Etude Droit Constitutional Positif Ch. Durand, Dr. en Droit; La Theorie Juridique De L'Etat Federale, M. Mouskeli, Dr. en Droit; Failure of Federalism in Australia, Canaway). The suggestion drafted by Mr. Pinckney was rejected (Records of the Federal Convention, Max Farrand, II, 334, 340, 341, 545, III, 122, 256, 290, 595, 599, 609). The rejection was of short duration. The ratifying states considered the fear of centralization in this instance exaggerated and the danger great. They insisted on the inclusion of a guarantee of free speech and assembly in the bill of rights. Elliot's Debates (2d ed. 1836) I, 359, 360, 362, 369, 371, 375, II, 424, 511, 537, III, 411, 414, 415, 481, 551, IV, 159, 175, 269, 301, 302; Pennsylvania and the Federal Convention, J. B. McMaster and F. D. Stone. Since then the Supreme Court has given its approval to the Blackstone definition. Patterson v. Colorado, above cited; Near v. Minnesota, above cited; Lovell v. Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949; Grosjean v. American Press Co., above cited. The principal dispute has revolved around the validity of a distinction between prevention and repression above referred to. It would be accurate to say, we think, that the high court has found a distinction but has divided both in the same and in different decisions between clear and present (imminent) danger and tendency, remote or otherwise, as a definition of that distinction. Schenck v. U. S., 249 U.S. 47, 39 S. Ct. 247, 63 L.Ed. 470; Frohwerk v. U. S., 249 U.S. 204, 39 S.Ct. 249, 63 L.Ed. 561; Debs v. U. S., 249 U.S. 211, 39 S.Ct. 252, 63 L.Ed. 566; Abrams v. U. S., 250 U.S. 616, 40 S.Ct. 17, 63 L.Ed. 1173; Schaefer v. U. S., 251 U.S. 466, 40 S.Ct. 259, 64 L. Ed. 360; Pierce v. U. S., 252 U.S. 239, 40 S.Ct. 205, 64 L.Ed. 542; O'Connell v. U. S., 253 U.S. 142, 40 S.Ct. 444, 64 L.Ed. 827; Gilbert v. Minnesota, 254 U.S. 325, 41 S.Ct. 125, 65 L.Ed. 287; Grosjean v. American Press Co., above cited; and Herndon v. Lowry, 301 U.S. 242, 57 S.Ct. 732, 81 L.Ed. 1066.

Free assembly is free speech in particular circumstances. It is in one sense free speech carried to its ultimate and logical conclusion and in another free speech in its most complicated and delicate phase. However that may be, the history and philosophy of free speech itself are applicable and in so being account for the comparative paucity of material on free assembly. Apart from the foreign sources referred to later, we have found the authorities to be as follows: (a) One reference by Representative Sedgwick in the Debate on the Bill of Rights, Annals of Congress (1788) p. 759; (b) a chapter in Liberty of the Press, Speech and Public Worship, Paterson (Chapter 2, Freedom of Public Meetings and Addresses and Petitions), and one in The Law of the Constitution, Dicey, (Chapter 7, The Right of Public Meeting); (c) sections in Paterson and the New York Committee book, above cited, those sections being entitled, Freedom of Thought as Developed in Public Meetings, Chapter 1, p. 12, Paterson; Freedom of Assembly as an Independent Right, Chapter 12, section 3, p. 154, New York book; and Publication, Speech or Assembly Which Creates a Danger That Unlawful Acts Will Be Committed, Chapter 12, section 4, p. 163, New York book; (d) four

law review articles, The Right of Assembly, 9 New York University Law Quarterly Review 1, Jarrett and Mund; Public Order and the Right of Assembly in England and the United States—a comparative study, 47 Yale Law Journal 404; Police Powers and Public Meetings, 6 Cambridge Law Journal 175, E. S. Wade; Reasonable Restrictions Upon Freedom of Assembly, Vol. 9, Proceedings of American Sociological Society p. 29, Hon. Arthur Woods, Police Commissioner; (e) two law review notes, Limitations on the Right of Assembly, 23 California Law Review 180; Restrictions on the Right of Assembly, 42 Harvard Law Review 265; (f) debates in the House of Commons on the Public Order Bill of 1936 (1 Edw. VIII and George VI, Chapter 6, p. 60) 317 Parliamentary debates 1350, also 318 Parliamentary debates 150, 582, 1730; (g) certain United States Supreme Court cases all of which except one commingle the right of free speech and free assembly in the same case, U. S. v. Cruikshank, 92 U.S. 542, 23 L.Ed. 588; Davis v. Commonwealth of Massachusetts, 167 U.S. 43, 17 S.Ct. 731, 42 L.Ed. 71; De Jonge v. Oregon, 299 U.S. 353, 57 S.Ct. 255, 81 L.Ed. 278; Herndon v. Lowry, 301 U.S. 242, 57 S.Ct. 732, 81 L.Ed. 1066; (h) and two books not available in the United States, Law of Political Uniforms, Public Meetings and Public Armies, Baker; Law Relating to Public Meetings and Processions, Crew.

Inasmuch as free assembly is a special form of free speech, the philosophy of the latter applies. Because it is only a form of free speech we can expect to find and do find that philosophy and that history modified by the particular form. For that reason, if for no other, we need not indulge in any elaborate discussion and confine ourselves therefore to a few quotations on both of the stated phases and to a short history.

A. Free assembly is a special form of free speech:

"Closely connected with the right just mentioned is the right of citizens peaceably to meet and to take public matters into consideration." Civil Liberty and Self-Government, Francis Lieber, Chapter 12, Sec. 16, p. 127.

"So long as such public meeting can be held at the call of any voice from the crowd, and the people can meet in any numbers without let or hindrance and discuss and exchange their sentiments on anything and everything that concerns them—that touches their interests or their feelings—this is as near the enjoyment of perfect liberty as is attainable." Paterson, above cited, at pp. 12, 13.

"The right of assembly is a self-evident, inalienable right of the people and to dwell at such length upon it must make us appear trifling in the eyes of our constituents. It might as appropriately be declared that a man should have a right to wear his hat if he pleased; that he might get up when he pleased and go to bed when he thought proper. Surely it was not necessary to enter these trifles in a declaration of rights in a government where none of them were intended to be infringed." Annals of Congress 1834, 759.

"The close relationship between the right to assemble and the right to speak and publish is apparent. Indeed, to many, the function of freedom of assembly is merely to give occasion and force to freedom of speech and press." New York Committee book, above cited, p. 154.

"Man is a gregarious animal. Since earliest times men have assembled together for purposes of feasting, hunting, sympathy, and companionship. In the course of time when the family or household became the economic unit, people assembled for social, religious, political and judicial purposes." The Right of Assembly, 9 N.Y. U. Quarterly Law Review, p. 1 at 4.

B. Because it is only a form of free speech:

"The ancient tyrants always feared any large congregation of men in towns, and endeavored to find rustic occupations for them, so as to separate them and divert their minds; and it is said Peisistratus commenced the building of the Temple of Jupiter for some reason of this kind." 2 Thirlw.Gr. 71.

"The right of assembly thus appears more restricted than many other elements of personal liberty. This is inevitable, for in the misuse of concerted group action lies the most powerful menace to public peace. Salus reipublicae suprema lex. But, for the present at least, the limit of restriction seems to have been reached, and the rights of the individual demand a wise and fair application of the existing laws." Restrictions on the Right of Assembly, 42 Harvard Law Review at 269.

"A proper consideration of the law relative to any of the civil liberties must recognize the unique character of this brand of jurisprudence. Civil liberties derive their justification from a philosophy which tends to weaken or disappear in the face of passions and fears aroused by social stress and economic change. It is not enough to write freedom of assembly into the constitution. The constitution is not self executing. Yet it takes on vitality in direct proportion to the unpopularity of the groups whose liberties are successfully guarded.

"If freedom of assembly is not protected ·on the immediate occasion, it stands little opportunity of later vindication. Minority groups are seldom equipped with the requisite funds or influence to render vindication by legal process either consistent or certain. The consequence is a sporadic declaration of the lawfulness of a disrupted meeting, the occasion for which has long since passed." Pages 191, 192.

"The subject is a confused and difficult one. A proper balance between civil liberty and public safety depends on a long maintained tradition of wisdom and moderation in the laws themselves, and no less wisdom and moderation in their administration." Page 193, Limitations on the Right of Assembly, 23 California Law Review 180.

"To those who wish to preserve free speech, more pressing problems are presented by the limitations on the right of public assembly, for the cumulative effect of these restrictions is serious. Repression of this sort is sought to be justified by the plea that it is necessary to maintain the public order. Some restrictions are necessary to curtail conduct which actually interferes with the public safety, but these measures are frequently used where the threat of disturbance is remote. In the long run the public order may best be served by risking a little disorder. To let off steam may scorch the ceiling; it does not blow off the roof.

"Several proposals for reform recur. It is sometimes urged that all discretion be taken away from the law-enforcing agencies. The suggestion is futile. Every statute, every ordinance must look to men for its interpretation. But this study has indicated that the wording of statutes does have some significance.· It might therefore be helpful to attempt to tighten up those statutes seeking to maintain the public order. Within broad limits, a standard of conduct can be described which should be extremely difficult to twist or distort. But a word can have only that meaning which a man imports to it.

"There is of course some hope that the law-enforcing agencies might be induced to use their discretion more wisely. The American policeman might at least be taught to follow the example of his English contemporary by discarding some of his more brutal tactics. And judges might be educated to be frankly suspicious of police administration in civil liberties cases. But these vague hopes are hardly likely to be achieved." Public Order and Right of Assembly, 47 Yale Law Journal, page 404 at 431, 432.

"If you are going to allow the free play that is necessary for political demonstration and discussion in a democracy you must sometimes have occasions when tempers and feelings run high in particular districts and you must then have the liability of some public disorder taking place." Debates on Public Order Bill (House of Commons) Vol. 318, Parliamentary Debates, 1936-1937, p. 182.

But see contra: "But liberty, gentlemen, must not be converted into license. What they ask for is license, and this I shall never grant! You can, if you wish, organize and march along in processions and I shall have you escorted." Mussolini as Revealed in His Political Speeches, November, 1914–August, 1923, by Bernando Quaranta di San Severino.

The same may be said of the history of free assembly. If free speech was considered obnoxious and was restricted, its indulgence in the presence of more and perhaps involuntary listeners must be deserving of even more attention. So in the England of Charles the Second the judges were consulted as to whether the King could by proclamation shut up the coffee houses (nurseries of ·idleness and pragmaticalness). It was not apparently until the excitement attendant upon the expulsion of Wilkes from the House of Commons that the holding of public meetings was developed. The government acted promptly to prevent any meetings called except by public officials. 32 Parl.Hist. 308, 35 Parl.Deb. 1230. It took similar action 20 years later when the delay in the reform of Parliament led to the irritation of the people and the Manchester meetings. This last enactment was limited to five

years and since then speech at public assemblies in England has been subject only to conditions peculiar to them and accordingly more appropriately developed later in this opinion. In this country we have been able to find practically no separate history of free assembly as distinguished from free speech other than that developed in the cases and in the articles and books already cited. We have already quoted the only reference to the matter in the Debates on the Bill of Rights. The guarantee itself is in effect in nearly all the state constitutions.

"A survey of the state constitutions today reveals that all but four states have made an express guarantee of this right. (The four exceptions are Maryland, Minnesota, New Mexico and Virginia). Aside from these four exceptions, the state provisions show a marked degree of similarity. They may be classified first of all into two major divisions: The temper or manner of assembly; and the purpose of the assembly." The Right of Assembly, 9 University Law Quarterly, New York, above cited, at p. 16.

This survey of the philosophy and history of liberty, free speech and assembly leaves an impression of some qualification of their meaning. We ascribe that qualification to the nature of democracy itself. That type of government is based on the consent of the governed. It is based on peace and opposed to violence. It follows that in violence we must look for the limitations on or qualifications of the meanings we have been discussing. That violence may be directed against the government itself, it may be directed by some of the people against others of the people.

This right of the government to protect itself against violence has not always been acknowledged.

"But mere verbal insults were not considered treason (Digest or. Pandect, 48th Book, 4th Title, 7th Fragment, 3rd edition); for said the Emperors Theodosius, Arcadius, and Honorious, in language that is a standing rebuke to pusillanimous tyrants, if the words are uttered in a spirit of frivolity, the attack merits contempt; if from madness they excite pity; if from malice, they are to be forgiven." Code of Justinian 9th Book, 7th Title, First Constitution.

"I hold that a little rebellion now and then is a good thing, and as necessary in the political world as a storm is in the physical. * * * An observation of this truth should render honest republican governors so mild in their punishment of rebellions as not to discourage them too much. It is a medicine necessary for the sound health of government." Thomas Jefferson.

"This whole theory as to the power of society to displace the holders of governmental authority, is, of course, merely one version of the so-called 'right of resistance'. Locke's phrase for designating this right is the 'appeal to Heaven', which he regards as the privilege not only of the body of the people but even of any single man.

* * * * * *

" 'The people' are as a rule 'more disposed to suffer than right themselves by resistance.' Only when injustice and oppression have gone very far and have become obvious to a majority of the people will the 'appeal to Heaven' actually be made." Political Theories, From Luther to Montesquieu, Dunning, p. 362–363.

It can be attributed to the right of self-preservation and as such is applicable to every form of organized society. Commonwealth v. Widovich, 295 Pa. 311, 145 A. 295. Our own attribution seems more in the spirit of the democratic circumstance. At any rate, it is acknowledged and any doubts relate first to the wisdom of its exercise in respect to mere words as opposed to acts and second what words should be proscribed or punished. (Cf. United States Supreme Court cases and articles cited under distinction between prevention and repression). In this last aspect we have again the cause and effect problem of Judge Learned Hand's famous phrase about words as the "triggers of action rather than keys of persuasion" and presumably the same difference among the judges as to its correct answer.

The people of the United States have shown a complete faith in the effectiveness of dealing with words even before they are transmuted into deeds and have not been impressed with the quotations expressed in the sentiments of two English legal worthies:

"The sergeant in a very grave speech laid open the inconvenience of making words treason—they were often ill-heard and ill-understood and were apt to be misrecited by a very small variation." Bishop Burnett's History of His Own Time, Vol. 3, p. 39.

"How dangerous it is to depart from the letter of that statute and to multiply and enhance crimes into treason by ambiguous and general words such as accroaching of royal power, subversion of fundamental laws and the like. Since this offense which from its nature is so capable of being created and judged of by rules of political expediency is made the spear of the occasion." Erskine.

This faith and its resulting action seems to have followed closely upon the alarm natural to manifestations here and in the world generally of symptoms more germane to political systems based not upon the peaceful consent of the governed but upon the violent coercion of the dissenting. So after the French Revolution we had the alien and sedition law and after the tragic assassination of President McKinley the anarchy statutes; a typical one is Laws of New Jersey, Ch. 133 (1902), R.S.1937, 2:173–6 et seq. The Nation and the Anarchists, Wambaugh, 13 Green Bag 461, 25 N.J.Law Journal (1902) p. 32, editorial note; Charge to the Grand Jury, 31 N.J.Law Journal (1908) p. 140, and see also State v. Boyd, 86 N.J.L. 75, 91 A. 586. The spirit behind all this legislation is well epitomized in Burke's reflections on the French Revolution: "These associators to prosecute, who keep watch of late upon our words and upon our looks, are associated, it seems, to preserve our excellent constitution from the contagion of France, where an arbitrary and tyrannous democracy, under the colour of popular freedom, destroys all the securities and blessings of life—but how does it destroy them? How, but by the very means that these new partners of executing power would themselves employ, if we would let them."

And see also: "Fisher Ames died in 1808 obsessed by fears his children (one of whom lived to be Chief Justice of Massachusetts), must look forward to their future servitude to the French." Henry Adams, History of the United States, 183.

Their success or failure is in the case of the Alien and Sedition Law a matter of past history. The American Leviathan —The Republic in the Machine Age, Beard, p. 55. In the case of the anarchy and criminal syndicalism statutes it is a matter of present prophecy.

■ We have given these possible qualifications of the significant constitutional words on the theory that their assumption may eliminate the unsatisfactory factual disputes that beset law suits. Let us now consider them in the light of the defendants' specific acts. We have seen that they fall into five different categories. First the police of Jersey City removed (or excluded if prompt enough) the plaintiffs from the municipal limits. This removal (or exclusion) was by administrative (police) fiat alone. They exercised a censorship of persons. The constitutional word applicable here is that appropriate to persons, namely, liberty. That liberty includes the right of locomotion (movement) is both obvious and recognized by the writers:

"The right of locomotion, or of free egress and regress as well as free motion within the country, is another important individual right and element of liberty." Civil Liberty and Self-Government, Lieber, above cited, p. 95. Also Manual of Political Ethics, Vol. 1, Lieber; Book 2, Chapt. 5, p. 184.

"I should say that it means exemption or immunity from unlawful imprisonment or detention of the body, freedom to go and come on lawful business or pleasure, commonly called the right of locomotion; the right to acquire, hold and convey property; the right to make contracts and to labor in any lawful calling to earn a living; to marry and have family." A Treatise on the Rights and Privileges Guaranteed by the Fourteenth Amendment of the Constitution of the United States, Brannon at 110.

"There are naturally few invasions of this cardinal right so far as a man's person or free movement is concerned in our country." (97.)

"Further, the right to liberty includes constitutionally the right to move, go and come, live where he will, emigrate, and if a citizen, to return; also to forswear his allegiance and expatriate himself, but not against his will; he can never, even as a punishment for crime, be banished." (99.) The American Constitution as it Protects Private Rights, Stimson.

And by the cases: The Passenger Cases, 7 How. 283, 12 L.Ed. 702; Crandall v. Nevada, 6 Wall. 35, 18 L.Ed. 745; Williams v. Fears, 179 U.S. 270, 21 S.Ct. 128, 45 L. Ed. 186; Twining v. New Jersey, 211 U.S. 78, 29 S.Ct. 14, 53 L.Ed. 97; Territory of Hawaii v. Anduha, 9 Cir., 48 F.2d 171; U. S. v. Miller, D.C., 17 F.Supp. 65.

Although relegated to the general terms in the law of England and in our Constitu-

tion, it has been considered deserving of specific mention in the constitutions of other federations.

"Art. 44 Aucun canton ne peut renvoyer de son territoire un de ses ressortissants, ni le priver du droit d'origine ou de cite.

"Art. 45 * * * Exceptionnellement, l'etablissement peut etre refuse ou retire a ceux qui, par suite d'un jugement penal, ne jouissent pas de leurs droits civiques." Swiss Constitution, 1874.

Translation: "Art. 44 No Canton can send out from its territory anyone of its residents nor can it deprive anyone of his right of domicile or of citizenship."

"Art. 45 * * * By way of exception the right to settle can be refused or withdrawn from those who by reason of conviction of crime have lost their civil rights."

"Art. 14. All the inhabitants of the nation shall enjoy, subject to the laws regulating their exercise, the following rights, to wit; to work and engage in any lawful industry; to navigate and engage in commerce; to petition the authorities; to enter, remain in, travel through, or leave the Argentine territory; to publish their own ideas through the press without previous censorship; to use and dispose of their property; to associate together for useful purposes; freely to profess their religion, and to teach and to study." (Constitution of the Argentine 1898.)

■■■■ The liberty being acknowledged, any interference with it must be by due process of law. We need not cite authority either for the general proposition or for its particular application here since due process postulates a "day in court." A police officer is confined to an insistence on such day. In other words, he can arrest and convey to the reasonably convenient trier and nothing more. 5 Corpus Juris 430 and cases cited. This was acknowledged even in the Bisbee I. W. W. Deportation cases, State of Arizona v. Wootton, 6 American Bar Association Journal, Part 2, 99, pamphlet, The Law of Necessity, published by Bureau of Information (Arizona), where defense counsel said: "We expect to show that the jails in this county were inadequate within which to confine the said conspirators * * *". (Page 7.)

And the practice generally was condemned by a Pennsylvania Judge: " 'The action of the mob—I take pains to use the accurate word—in running out of town with

threats of violence, the officials of the miners' union, was sheer anarchy, an outrageous violation of the rights guaranteed by the Constitution to the humblest person.'" The Story of Civil Liberty in the United States, Whipple, p. 221.

■■■ This without more disposes of the so-called deportations. We go further however and maintain that neither a city, a state, nor the nation can resort to the banishment of its citizens even after a compliance with the due process and fair trial requirements and even as a punishment for crime. Any such drastic power is manifestly an attribute of sovereignty. As such it does not pertain to states and a fortiori to cities (Crandall v. Nevada, above cited, The Passenger Cases, above cited). Any contrary doctrine would destroy our national unity and relegate us to the passport system of earlier times. We find the learned author of "Das Passwesen", Walter Transfeldt, describing the former practice in Germany of requiring passports for domestic as well as foreign travel as follows: "A means of facilitating police supervision over travelling apprentices, beggars, former criminals, and suspicious characters and also a form of political check. The general point of view with respect to the passport requirements at that time in Germany as a supposed means of protection against politically dangerous persons, or against the introduction of new political ideas, was expressed most clearly by the pronouncement of the Confederation of May 5, 1832 (Protokolle d. Deutschen Bundesversammlung, 1832 S. 949, 953)." p. 18.

Dr. Paul Vallotton in his Dissertation De License Et De Doctorat takes us even further back into antiquity: "Tres anciennement il n'y avait pàs de trafic international des voyageurs dans le sens ou nous l'entendons aujourd'hui. L'etranger etait par definition l'ennemi et d'ou qu'il vint il etait accueilli comme tel". (Page 16.)

Translation: "In very early days there was no international travel in the sense we understand it now. The foreigner was by definition an enemy and wherever he went he was received as such."

If there could be some theory of quarantine it is applicable only in the field of physical science. Ideas are not Japanese beetles. This thought finds expression in the opinions of the United States courts:

"* * * While we unhesitatingly admit that a State may pass sanitary laws, and laws for the protection of life, liberty,

health, or property within its borders; while it may prevent persons and animals suffering under contagious or infectious diseases or convicts, etc., from entering the State; while for the purpose of self-protection it may establish quarantine, and reasonable inspection laws, it may not interfere with transportation into or through the State, beyond what is absolutely necessary for its self-protection." Hannibal & St. Joseph R. Co. v. Husen, 95 U.S. 465–472, 24 L.Ed. 527.

"It will be observed that no overt act is charged against any of the class of persons threatened and about to be imported by the defendant Coal Company over the defendant Railroad Company's lines. They are not alleged to be convicts or ex-convicts, nor are they alleged to be paupers, idiots, insane, or diseased persons. They are said to be 'armed,' and to belong to the 'low and lawless type of humanity'; not that they are low and lawless themselves, but are of that type. No statute of this state condemns the coming of such men hither. No expression of the legislative will relating to that class of men coming into the state has found a place in our laws. They are silent on the subject. It will be time enough to decide whether the state has the power to prohibit them coming when a proper case, based on such a statute, is brought to the attention of the court. It is enough now to say that, under the fourteenth amendment, and under the commerce clause of the constitution, they now have that right." State of Arkansas v. Kansas Coal Co., C.C., 96 F. 353, at page 368.

"And the power of exclusion by the state, as we have already said extends only to convicts, lepers, and persons incurably diseased, and to paupers and persons who, from physical causes, are likely to become a public charge." In re Ah Fong, 1 Fed. Cas. p. 213, 218, No. 102.

Furthermore, quarantine is limited by definition to a current condition and not to be exercised on the basis of the probability of the recurrence of a previous condition (past conduct).

Deportation therefore is sanctioned in the single instance (1) of aliens, (2) by the nation, (3) under certain specified circumstances. Two of these, as one might suppose, are anarchy and the advocacy of the overthrow by violence of the government whose hospitality they seek. Cases collected under Section 137, Title 8, U.S.C.A., particularly notes 5 and 6. Even here

some abbreviated but nevertheless actual hearing must be accorded the alien and the fiat of the administrative officer (here the immigration inspector and not the policeman) is not constitutionally sufficient. Cases collected under section 137, Title 8, U.S.C.A., note 9. Here also what words constitute such advocacy, is troublesome. Strecker v. Kessler, District Director of Immigration and Naturalization, 5 Cir., 95 F.2d 976, petition No. 330 for certiorari filed and granted (New York Times, October 21, 1938). This law and this procedure has been criticized. Freedom of Speech, Chafee, Chapter IV, The Deportations, p. 229.

We proceed from censorship of the persons claimed to have unpopular thoughts locked within their bosoms to prevention of communication of those thoughts. Thus we come to an interpretation of the constitutional word free. As we said earlier the attempted transmission of ideas to the people of Jersey City falls into two categories, to willing and to unwilling listeners. In the first category, the attempted penetration by opinion is by circular or leaflet distribution (the leaflets being by concession intrinsically harmless) and the "hiring of halls" for speakers.

At the beginning of this decision we spoke well of the candor displayed in the presentment of what is unquestionably a widely held point of view. We must make an exception in the leaflet maneuvers. We detect here traces of the least pleasant side of our profession induced no doubt, as we said, by the impossibility of reconciling the views of the Mayor and the Supreme Court. We think we detect these traces because the books are full of instances of similar tactics employed by the law departments of other cities governed no doubt by Mayors with similar views.

█ The strategy is the use of ordinances designed and phrased to protect the streets against being littered with the consequent clogging of sewers, fire and disease hazards and the traditional frightening of horses, People v. Armstrong, 1888, 73 Mich. 288, 294, 41 N.W. 275, 2 L.R.A. 721, 16 Am.St.Rep. 578; Wettengel v. City of Denver, 1895, 20 Colo. 552, 39 P. 343; Anderson v. State, 1903, 69 Neb. 686, 96 N.W. 149, 5 Ann.Cas. 421, for the purpose of protecting the minds of the people who walk those streets against being littered with certain kinds of ideas and again traditionally perhaps, being frightened. One might suggest the availability of street

cleaning departments or refuse receptacles and some courts have even declared these ordinances invalid on the ground of unreasonableness. Dillon, Municipal Corp., 5th Ed. sec. 589; People v. Armstrong, above cited; City of Chicago v. Schultz, 341 Ill. 208, 173 N.E. 276. Furthermore as the purpose is to prevent "casting away" or "throwing to the wind" there is a distinction between non-commercial and commercial (advertising) matter, the American tradition being to overcome sales resistance forcibly. City of Philadelphia v. Brabender, 201 Pa. 574, 51 A..374, 58 L.R.A. 220; Wettengel v. City of Denver, above cited; Coughlin v. Sullivan, 100 N.J.L. 42, 126 A. 177. However that may be, it is unnecessary to elaborate the point in view of the Supreme Court's treatment of an identical ordinance of a Southern city. In declaring it unconstitutional, Chief Justice Hughes said: "We think that the ordinance is invalid on its face. Whatever the motive which induced its adoption, its character is such that it strikes at the very foundation of the freedom of the press by subjecting it to license and censorship. The struggle for the freedom of the press was primarily directed against the power of the licensor. It was against that power that John Milton directed his assault by his 'Appeal for the Liberty of Unlicensed Printing.' And the liberty of the press became initially a right to publish 'without a license what formerly could be published only with one.' While this freedom from previous restraint upon publication cannot be regarded as exhausting the guaranty of liberty, the prevention of that restraint was a leading purpose in the adoption of the constitutional provision." Lovell v. Griffin, above cited, at pages 451, 452, 58 S.Ct. at page 669.

We were dissatisfied at the trial and we are dissatisfied now with the state of the record with respect to the private meetings. There the defense was a denial. The plaintiffs assert that they are unable to obtain private places in which to hold meetings and we have no doubt but that this is true. Counsel then offered to prove that this unavailability of forums is due to coercion by the City officials. His offer of testimony was bottomed on the statements of the hall owners made to the plaintiffs or some of them. We held, whether rightly or wrongly is not for us to say, that such evidence could not come from the plaintiffs but must come from the very persons assigning these reasons for their refusal to rent. The May-

or with the frankness before adverted to denied that the city had brought pressure to bear and explained the situation on the ground that the hall owners shared the general allergy (the word is ours, not the Mayor's) of Jersey City people toward these plaintiffs.

We are skeptical enough to realize that municipal authorities (like other authorities) are possessed of indirect means of coercion. In fact it was unnecessary for counsel to point this out and in doing so they might very well have referred to previous instances of such tactics.

"Under the 'architectural police regulations' in Vienna it is technically impossible to build a theater so as to make it a profitable undertaking. Yet new theaters are built and flourish, while old theaters that violate the main principles of the regulations are maintained. The good-natured authorities are willing to close one eye to illegalities, on the tacit understanding that he who profits by such indulgence will not be recalcitrant should the convenience of the state require pliancy on his part. The manager of a theater who should refuse to remove from the playbill a play displeasing to the authorities, or should insist upon the circumstance that the play had been authorized by the censor might find the sanitary arrangements of his theater declared to be insufficient by a special commission, or the condition of the ceiling perilous, or the fire exits much too narrow." The Hapsburgh Monarchy, Wickham Stead, p. 76.

"In most cities, hall licenses may be revoked at any time because of structural defects in the building. An 'understanding' or 'gentleman's agreement', exists in some cities whereby hall-owners submit all programs of public meetings to the police department for its approval.

"In exercising this discretion it is evident that the purpose of the assembly plays the leading role." The Right of Assembly, 9 N. Y. U. Law Quarterly Review, p. 1 at 29, 30. And see, also, 11 Mass.Law Quarterly Rev. 25, The Inquiring Mind, Chafee, Chapter entitled The Freedom of the City, 144.

Whether this or something like it is the explanation in Jersey City, must in our view, come from the mouths of those who alone have first hand knowledge of it. In any event, the failure for whatever reason, to secure private meeting places emphasiz-

es the importance of the next issue, that of the right of public assembly.

To us the answer to this question is plain. The difficulty, if any, lies in the state of the authorities, a difficulty often encountered in a precedent-controlled legal system. If those authorities contained a direct ruling by our highest court, our duty would end there. In our judgment, they do not. We are free therefore to decide the matter upon principle as we see it.

We hope our recital of the history and the rationale (vicariously) of free speech carries conviction. That history and that theory has been recognized in our constitution. The communication of thought, unless you believe in mind-reading, requires some mechanical means. In the case of speech, one needs some place to speak in' and some people to listen. The public meeting has been called the "platform of the poor". Lacking the money or perhaps in Jersey City the goodwill, sufficient to obtain some private place, the would-be orators are forced to resort to publicly owned places.

"One great obstacle to the right of public meetings has always been the finding of a place of meeting large enough, and not too large, for the purpose of hearing and being heard. This, indeed, is a difficulty which more peculiarly affects the poorest portion of the community, it being always within the power of the wealthy to obtain by purchase or some valuable consideration access to a convenient place if they choose to undertake such preliminary expense." Paterson, above cited, p. 21.

"Recognition of the fact that there is no real alternative to use of the streets except complete silence should remove entirely the claim that the city's proprietary interest gives it some special power over public places." 5 International Juridical Association Monthly Bulletin, Ordinances Restricting Leaflet Distribution, 147 at 149.

"Unfortunately, however, these constitutional provisions do not guarantee a place for the people peaceably to assemble, and restrictions on street meetings in this country are consequently as extensive as in England." Public Order and Right of Assembly, 47 Yale Law Journal, above cited, at 412.

We are willing to eliminate the streets or squares from such resortable places. We question whether the easement of passage includes the quite inconsistent right to obstruct passage (sed quaere whether a procession is a passing). Public Order, Jennings, 8 Pol. Quarterly 7, Public Meeting and Processions, 6 Cambridge Law Journal 161, above cited; Berden v. Wrigler, 1 K. B. 337. It will be noticed that the authorities cited are all English. For some quite, in our opinion, illogical reason the American cases do not seem to stress the obvious difference between a street and a park.

We are not willing to eliminate the latter. It seems to us that the purpose of most parks is the recreation of the public. Archer v. Salinas City, 93 Cal. 43, 28 P. 839, 16 L.R.A. 145; South Park Commissioners v. Montgomery Ward & Co., 248 Ill. 299, 93 N.E. 910, 21 Ann.Cas. 127; Kupelian v. Andrews, 233 N.Y. 278, 135 N.E. 502; Ramstad v. Carr, 31 N.D. 504, 154 N.W. 195, 200, L.R.A.1916B, 1160; Commonwealth v. Hazen, 207 Pa. 52, 56 A. 263; Northport Wesleyan Grove Camp-meeting Ass'n v. Andrews, 104 Me. 342, 71 A. 1027, 20 L.R.A.,N.S., 976. We include in that word recreation an easement of assemblage. We believe it is not limited to physical recreation (fresh air, sunshine and exercise) but includes mental recreation and therefore the opportunity to impart and receive instruction. We have used the limiting word "most" before parks because we concede that there are parks whose purpose is narrow. Such, for instance, as the Botanic Gardens (flowers) in Sydney, Australia (Fox v. Allchurch [1926] So. Australian State Reports, 384; Soldier's field (athletics) in Chicago (Coughlin v. Chicago Park Dist., 364 Ill. 90, 4 N.E.2d 1, Father Coughlin).

We hold then that a municipality's proprietary right is subject to an easement of assemblage in such parks as are dedicated to the general recreation of the public. We hold also that this easement of assemblage is clearly subject to a municipal right of regulation. To allow speakers at any place and in any number does not contribute to the enjoyment of the public. This was decided in an English case dealing with public meetings on Clapham Common, dated, incidentally, prior to the first of the cases cited in defendants' brief:

"Secondly, he contended that the common having been 'dedicated to and for the use and recreation of the public as an open and uninclosed space for ever', the board could not prevent the public from assembling there whenever they pleased for the purpose of hearing sermons, or lectures, or addresses, on any subject, religious, politi-

146

cal, or otherwise. If this argument were sound it would follow that any number of public meetings might be held at the same time in various parts of the common, even to the extent of monopolising the whole area * * *. Its object was to secure in perpetuity the common as a place which the public might use as of right for the purpose of recreation, and in order that all classes may at all times share in its enjoyment, the user of the common is necessarily placed under regulations." De Morgan v. The Metropolitan Board of Works, 5 Q.B.D. p. 155 at 158.

By the same token the only feasible method af carrying out such regulation is by way of permit. This alone saves the ordinance in the case at bar even if it had been based on the park section of the city empowering act alone, Laws of New Jersey 1917, chap. 152, art. 36, § 2, at p. 452, R.S.1937, 40:61–1(f), and had omitted the blood-curdling words of the more general power repeated in the ordinance itself.

■ What is the constitutional scope of this easement of assemblage? Or to put it another way does the right of free assembly bar any regulation of public meetings except the limited proprietary regulation just discussed? Under a literal application of the previous restraint doctrine of Blackstone, it does. We are aware that the Supreme Court has expressed its approval of the Blackstonian theory. Patterson v. Colorado, above cited; Near v. Minnesota, above cited; Grosjean v. American Press Co., above cited; Lovell v. Griffin, above cited. These are, however, not strictly cases of public meetings and we think that they and their doctrine are not consistent with what we have seen to be a limitation implicit in the right of free assembly. This limitation is the sovereign's interest in the public peace. Liberty of the Press, Speech and Public Worship, Paterson, above cited; Dicey's Law of the Constitution, Ed. 4th, above cited; Restrictions on the Right of Assembly, 42 Harvard Law Review 265, above cited; Public Order and Right of Assembly, 47 Yale Law Review 404, above cited; The Right of Assembly, 9 N. Y. University Law Quarterly Review 1.

■ Our decision in the case at bar does not, however, as we see it entail a final decision of this question. For we believe that

the justifiable condemnation of previous restraints on public meetings and a salutary interest in the public peace are reconcilable by a procedure that is not being followed in Jersey City. As it is not followed, the invocation of the ordinance against the plaintiff applicants is in violation of the free assembly guaranteed by the First Amendment of the Constitution, U.S.C.A. Const. Amend. 1, and must be restrained.

■ We deem this to be the correct constitutional procedure. Before refusing the permits the municipal authorities must have proof (reviewable, of course, in the court) that the present applicants at least have spoken in the past in such fashion that audiences similar to those to be reasonably expected in Jersey City have indulged in breaches of the peace. If that proof were made, we think that either a copy of the speech to be currently delivered could be required and censored in the light of the reasonable apprehension of disorder of "firm and courageous" city officials or else the speakers could be bound over to keep the peace and be of good behaviour. The adjectives "firm and courageous" will be recognized as those of the law pertaining to unlawful assembly and seem to us for that reason appropriate here. Halsbury's Laws of England, 2nd Ed. Vol. 9, p. 312; The Law Relating to Riots and Unlawful Assemblies, Vol. 35, The Legal Observer 469; The Law Relating to Unlawful Assemblies, Vol. 26, The Legal Observer, 545; Riots, Routs and Unlawful Assemblies, Vol. 3, American Law Magazine (article 6) 350; Suppressing of Riots by Military Interference, Vol. 9, The Law Magazine 66; International Responsibilities of States, Vol. 8, The American Journal of International Law 802; Riot—Concert of Action—Acts of Violence by two of Unlawful Assembly constitutes "Riots", Vol. 13 Virginia Law Review 329; The Law Relating to Riots, A. H. Brodkin, 3rd edition; State v. Butterworth, 104 N.J.L. 579, 142 A. 57, 58 A.L.R. 744. The practice of binding over although useful is not as common in this country as it is in England.

"When magistrates are satisfied by evidence that if such persons are allowed to proceed with the proposed meeting a breach of the peace is likely to be caused, they may call upon the persons in question to enter into recognizances on their own behalf and in addition, if the Court thinks fit, to find other persons to enter into recog

nizances as sureties for them, that they will keep the peace or be of good behaviour." Law of Public Meeting, Mann and Llewellyn, Research by Committee of Haldane Club.

"Take the case of an organization which has a demonstration with a slogan without question and in fact provokes disorder. The police under the conditions which already exist can say to the promotors next time they come for a permit. 'The last time you had one you put those words up and they caused a row, and if you are going to have this procession you must give an undertaking that you will not have anything of the kind again.' That would be all right, but if the police have to ask for all these emblems, banners and flags to be exhibited and they exercise a censorship, I suggest they would be put in an impossible position." House of Commons Debates, Vol. 318, p. 163. And see Assembly When Unlawful, 26 Solicitors Journal 689, The King v. Sandbach, Ex parte Williams, 2 K.B. 192, 6 Cambridge Law Journal 175 (Police Powers and Public Meetings, Wade), above cited. We need hardly add that the record in the case at bar discloses nothing about the happenings at previous meetings addressed by the plaintiff applicants.

█ We inserted the qualifying "at least" in the last paragraph because it leaves open a much debated question: Should the speaker's words be judged from the standard of a court's view of their effect on an average audience constituted as the particular gathering or should they rather be considered from the aspect of their effect on a say weak-minded or malicious audience? We must recognize a certain ability to withstand provocation. Otherwise we have not freedom but indifference. Moreover a pandering to possible audiences leads to mob censorship. On the other hand, must blood be shed in the effort to convert those possibly impervious to conversion? The question is again that matter of balance. We agree with the earlier English cases and hold that the speaker's own conduct is the criterion. If he observes the decencies of discussion, he should be given the full protection consistent with the strength of the local guardians of public safety. The question has been much discussed in England. In the case of Beatty v. Gillbanks, 9 Q.B.D. 308, dealing with the breaking up of meetings of the Salvation Army by a so-called Skeleton army, the learned justice said: "What has happened here is that an unlawful organization has assumed to itself the right to prevent the appellants (Salvation Army) and others from lawfully assembling together, and the finding of the justices amounts to this, that a man may be convicted for doing a lawful act if he knows that his doing it may cause another to do an unlawful act. There is no authority for such a proposition, and the question of the justices whether the facts stated in the case constituted the offence charged in the information (unlawful assembly) must therefore be answered in the negative."

The doctrine was affirmed in Wise v. Dunning [1902] 1 K.B.D., p. 167, where the preventive arrest of a protestant agitator was approved on the ground that he had used language insulting to the Catholic religion, in neighborhoods inhabitated largely by Catholics. In the recent case of Duncan v. Jones [1936] 1 K.B.D., p. 218, the Lord Chief Justice turned the flank of these decisions in upholding an inspector of police (Jones) in preventing Mrs. Duncan from holding a meeting outside an unemployment training center. The evidence showed that there had been disturbances at previous meetings held by Mrs. Duncan but did not indicate the character of the language used by her. These three cases have been discussed and the last one criticized by a learned author writing in Cambridge Law Journal, Vol. 6, p. 175, 1937. Dr. Wade says at pages 181 and 179:

"Nor need the police as regards meetings generally, and apart from the question of obstruction to the highway by street meetings, have greater power than could be prescribed by enacting the distinction between Beatty v. Gillbanks and Wise v. Dunning, whereby police interference is authorized where insulting or abusive language takes place, but is not permitted simply on account of expression of opinion in circumstances which may expose the speaker to attack from outside."

"The case thus leaves the law in the unsatisfactory position that it is for the police to decide whether a political party can organize a meeting in a district where its opponents are known to be hostile. The apprehensions of a single policeman based upon the fears of somebody else may apparently be decisive."

And see also the opinion of the Lord Ordinary in the case of M'Ara v. Edinburgh, 1913 Session Cases, p. 1059, 1070: "The proclamation if effectual would dispense with the necessity of both trial and conviction and would subject a citizen to disabilities merely because the magistrates in their private room had come to the conclusion that his conduct was calculated to produce obstruction or breach of the peace."

Our position does make past conduct a cause of future restraint. We are aware of the fact that this is censorship. This was pointed out in articles criticizing the decisions of the courts in the cases of Trinity Methodist Church, South, v. Federal Radio Comm., 61 App.D.C. 311, 62 F.2d 850, certiorari denied 288 U.S. 599, 53 S.Ct. 317, 77 L.Ed. 975; KFKB Broadcasting Association v. Federal Radio Commission, 60 App.D.C. 79, 47 F.2d 670 (Dr. Brinkley's station) and U. S. v. Burleson, 255 U.S. 407, 41 S.Ct. 352, 65 L.Ed. 704, the learned authors saying:

"The only reason that past conduct was a matter of any concern is because it was assumed that future conduct would be the same * * * This is not something resembling censorship, it is censorship in fact, the very essence of it. To say under these circumstances, that because past releases had not in fact been subjected to prior scrutiny, therefore there was no censorship, is a misconception of the practical effect of the decision as well as of what constitutes censorship." 1 Journal of Radio Law, p. 441, 470.

"It is mere quibbling to say that it is not censorship to refuse the renewal on the basis of past conduct, since the refusal intended to prevent what might be said over the station in the future—the most effective sort of censorship." 1 Duke Law Journal, pp. 49, 50.

"Because the paper had published forbidden matter for the five preceding months it was likely to continue doing so." 21 Georgetown Law Journal, pp. 35, 161, 186, and see also 46 Harvard Law Review 987, and 22 Kentucky Law Journal 634.

Such censorship has been upheld by the United States Supreme Court in the case of the mails (United States v. Burleson, 255 U.S. 407, 41 S.Ct. 352, 65 L.Ed. 704, above cited; and see, also, Lewis Publishing Co. v. Morgan, 229 U.S. 288, 33 S.Ct.

867, 57 L.Ed. 1190) and impliedly in the case of the radio Shuler Broadcasting case, Matter of Shuler, 210 Cal. 377, 292 P. 481 (certiorari being refused). In those cases the action sustained went far beyond the view we have here expressed for the allegedly objectionable newspaper and orator were thrown out of the mails and off the air respectively. It is true that mechanical considerations and by definition spot character of news make the submission of advance copy either destructive of efficiency or else creative of bureaucracy. This is not true of the delivery of speeches. They might suffer in spontaneity but there are those who think that the listening public would welcome the compensating gain in thoughtfulness.

Before proceeding to a consideration of the American cases it may be of interest to make some examination of the way in which the same problem is dealt with in the legal system of the other nations. We cannot and of course do not offer any of this foreign law as a binding constitutional precedent here. We think its citation serves two purposes, both of them at least moderately useful. First, because to learn by that form of experience which is example, whether good or bad, is standard for us erring humans and comparisons whether odious or not are certainly helpful. Second, the practices of government in other countries properly belong in the laboratory of political science which, as we have said, we believe is pertinent to the interpretation of any charter of government written in general terms.

In setting forth the foreign authorities we notice that we have already dealt with the mother country, England. That is because we need hardly say her legal system is directly relevant to ours and to our Constitution. We make only this comment on the law we are quoting. We find the same disagreement as to the proper method of regulating public meetings that exists in our country and in our cases. That division is between the democracies and the autocracies verbum sap.

### A. Democracies

France.

1. In French:

(a) "A-t-on jamais reglemente le droit de respirer? Le droit de parler et de se reunir lui parait etre due meme ordre. Les abus et les bagarres doivent evidem-

ment etre reprimes et la police qui rode toujours aux abords des meetings se doit d'intervenir en cas de paroles seditieuses ou menacantes ou se l'on en vient aux coups." p. 13.

(b) "Il (le legislateur) peut exiger une declaration prealable, mais il ne peut point subordonner les reunions publiques a une autorisation prealable. Il peut, il doit meme interdire les reunions sur la voie publique, parce qu'elles entraveraient la circulation publique et qu'il peut et doit limiter la liberte de chacun pour proteger la liberte de tous. Enfin, il peut organiser la constatation et la repression des delits pouvant etre commis dans les reunions publiques. S'il va au-dela, il excede ses pouvoirs, il porte atteinte a la liberte de reunion." pp. 277–278. Les Meetings—Essai sur les Caracters Politiques et Juridiques de la Liberte de Reunion en Angleterre by Paul Mousset.

2. Translated:

(a) Has one ever regulated the right of breathing? The right of speaking and of assembly seems to fall in the same category. Abuses and riotings are manifestly to be suppressed by the police, who are always present at the meetings and intervene whenever seditious or menacing words are used or if there is any fighting.

(b) He (the legislator) can require a preliminary notice but he cannot subject public meetings to a permit. He can, he often should, forbid meetings on the public streets, because they are dedicated to the public passage, and so he should limit the liberty of each person in order to protect the liberty of all. Finally, he can bring about the discovery and repression of crimes likely to be committed at public meetings. If he does more than that, he goes beyond his powers. He limits the liberty of public assembly.

See, also, the Constitution of Spain, Art. 31, 38, Constitution of 1931.

Ireland, Constitution of 1922, art. 9:

"The right of free expression of opinion as well as the right to assemble peaceably and without arms and to form associations or unions is guaranteed for purposes not opposed to public morality. Laws regulating the manner in which the right of free assembly may be exercised shall contain no political or religious or class distinction."

Brazil.

"In a case decided in 1917 (Accordao No. 4,313, of July 11, 1917), the court held that the police had power to localize the meetings by indicating the place or places where they might be held, and to prohibit them whenever they had adequate grounds to fear that public order would be disturbed or when the purpose of a meeting was manifestly criminal. In such cases the promoters of a meeting may invoke the remedy of the habeas corpus, the court then entering into the question whether the grounds alleged by the police were sufficient to justify their action."

"Against this decision, Ruy Barbosa protested in the federal senate on the ground that it adopted the policy of prevention, forbidden by the constitution, instead of the policy of repression, which limits itself to holding persons responsible for acts performed, in the abuse of their liberties. Thereupon, in a similar case decided in 1919, the supreme court reversed its position and denied the power of the police to designate the place in which the meeting shall be held." Constitutional System of Brazil, James, p. 148.

### B Autocracies

Italy, Constitution of 1848.

"Art. 32. The right to peaceful assembly, without arms, is recognized, subject, however, to the laws that may regulate the exercise of this privilege in the interest of the public welfare. This privilege is not applicable, however, to meetings in public places or places open to the public which shall remain entirely subject to police' law and regulation."

Germany.

1. Under the Prussian Constitution of 1850:

"Art. 29. All Prussians shall be entitled to meet in closed rooms, peacefully and unarmed, without previous permission from the authorities.

"But this provision does not apply to open-air meetings, which shall be subject to whatever restrictions the law may prescribe even with respect to previous permission from the authorities."

2. Under the Weimar Republic:

"Article 123. All Germans have the right to assemble peaceably and unarmed, without notice or special permission."

"Assemblies in the open (freiem Himmel) can by Imperial Statute, be made subject to notice, and can be forbidden in case of immediate (unmittelbar) danger to the public safety."

By a decision of the Reichsgericht 56 Entscheidungen des Reichsgerichts in Strafsachen, p. 184, it was said that a requirement of previous permission was inconsistent with this article 123, and void.

3. Under the present Reich:

"The law continued in this posture until 1932, when pursuant·to article 48 (2) of the Constitution, Hindenburg promulgated an emergency decree, providing for police supervision of all public meetings." RG B, 1932, 1, 548.

"In 1933, another emergency decree of Hindenburg's, A. Hitler Chancellor, (RG B, 1933, 1, 35) was passed providing for notice of all open air meetings, for police supervision, for prohibition in case of direct danger, and for complete prohibition upon the order of the Minister of the Interior. A week or so later, an emergency decree suspended Articles 114, 115, 117, 118, 123, 124, 158 of the Constitution, i. e. substantially the whole Bill of Rights, RG B, i 1933, 183." Systematische Übersicht Uber 71 Jahrgänge Reichsgesetzblatt 1867 to 1938.

We return now to our native shores and the cases in our courts. We find that the box-office score seems to be approximately 6 to 3 in favor of unrestricted administrative censorship. Commonwealth v. Davis, 162 Mass. 510, 39 N.E. 113, 26 L.R.A. 712, 44 Am.St. Rep. 389; Fitts v. Atlanta, 121 Ga. 567, 49 S.E. 793, 67 L.R.A. 803, 104 Am.St.Rep. 167; Love v. Phelan, 128 Mich. 545, 87 N.W. 785, 55 L.R.A. 618; People ex rel. Doyle v. Atwell, 232 N.Y. 96, 133 N.E. 364, 25 A.L.R. 107; Duquesne City v. Fincke, 269 Pa. 112, 112 A. 130; People v. Smith, 263 N.Y. 255, 188 N.E. 745. See, also, 47 Yale Law Journal 404, p. 413.

We do note, however, that the learned Supreme Court of New Jersey failed to mention three cases, In re Frazee, 63 Mich. 396, 30 N.W. 72, 6 Am.St.Rep. 310, State v. Coleman, 96 Conn. 190, 113 A. 385, and Anderson v. Tedford, 80 Fla. 376, 85 So. 673, 10 A.L.R. 1481. These three cases are those included in our minority and at least squint in the direction in which we are proceeding. It is true that some of the cases on the majority side talk feelingly of discrimination and its wickedness. In our view such talk is lacking in realism. We can not find the discrimination necessary for the operation of the privileges and immunities clause of the Constitution on the case at bar and the reported opinions give us the impression that other judges have been similarly baffled. One might suspect or even have a moral certainty but the plain fact is discriminatory minded city officials do not put it in the newspapers. This thought has been brought out in several of the law review articles previously cited.

"To subject the right or privilege of assembly to the uncontrolled discretion of an administrative official is to invite discrimination against those who hold and express theories or ideas repugnant to the community generally." Limitations on the Right of Assembly, 23 California Law Review p. 180, above cited, p. 192.

"Unfortunately, no effective means of preventing arbitrary or discriminatory exercise of such power seem available, although it has been suggested that a writ of mandamus might be used." Restrictions on the Right of Assembly, 42 Harvard Law Review p. 265, above cited, p. 267.

An analysis of these majority cases reveals this situation. In the year 1886 the high court of Michigan struck down an ordinance, saying: "It is only where power is given to license that permissive action can be left to particular cases. If this were allowed in the case of processions, it would enable a mayor or council to shut off processions of those whose notions did not suit their views or tastes, in politics or religion, or any other matter on which men differ. When men in authority have arbitrary power, there can be no liberty." In re Frazee, above cited, 30 N.W. at page 76.

Ten years later one Davis saw fit to ignore an ordinance of the city of Boston requiring permits to speak on Boston Common. This ordinance also prescribed a permit or license for various other activities such as firing cannons, vending merchandise and giving entertainment. The ordinance was manifestly reasonable and constitutional. It comes squarely within our theory that parks or commons are for the recreation of the public and would-be speakers as well as would-be cannon shooters and would-be Punch and Judy demonstrators must submit to regulation. Brother Davis was not refused a permit for the excellent reason that he did not ask for one. If he had, he might have been advised with respect to the place at which he should enlighten the citizenry in order that others not interested in his exposition might have an opportunity to enjoy them-

selves by avoiding him. Mr. Davis' zeal, in the words of Mid-shipman Easy's commanding officer, led him to speak anyway and to make, by the same token, we respectfully suggest, most of the opinion of the learned Massachusetts Supreme Court dictum. Com. v. Davis, 162 Mass. 510, 39 N.E. 113, 26 L.R.A. 712, 44 Am.St.Rep. 389. In other words the discussion of the municipal power to forbid speaking in public places absolutely is not necessary to the decision.

 The Davis Case was appealed to the United States Supreme Court and is found reported in 167 U.S. 43, 17 S.Ct. 731, 42 L.Ed. 71, that august body naturally did not affirm on the opinion below. They did, however, adopt part of the reasoning of the Massachusetts Court. In so far as that reasoning is dictum below, it is dictum above. More than that follows from the fact that the decision of the Supreme Court was rendered in 1896. At that time the United States Supreme Court felt that free speech was not protected by action against the states. We discussed this in an earlier portion of this opinion. So in the Davis Case we find Mr. Justice White expressly placing his holding on that ground: "The fourteenth amendment to the constitution of the United States does not destroy the power of the States to enact police regulations as to the subjects within their control." Page 47, 17 S.Ct. page 733. Any other language in the opinion becomes in consequence not only dictum but double dictum. It is entitled to the weight attaching to the lightest utterances of the members of our final tribunal but it is not binding either on us or on them.

The condition of the authorities, then, boils down to this: The Davis Case dammed the flow of a stream of precedents that had the earmark of giving a reasonable easement of assemblage in public places. This is apparent because the Davis Case is cited in every one of the subsequent cases holding its way. It appears to be cited furthermore without much internal examination. We find no reference to the matters just discussed. Our interpretation of them may be right or it may be wrong but it is assuredly relevant. If the dictum of the Davis Case falls, the cases following it take the same course and the numerical minority becomes the majority.

 Whatever we have said about the regulation of public meetings applies, a fortiori, to the display of placards by pickets or anyone else desirous of persuading the passer-by. The test is the same one of provocation and breach of the peace. Whatever differences exist are in favor of no previous restraint. A placard coming from the pen is easier of confiscation than words coming from the tongue. Spoken words have that quality of excitement or incitement lacking in cold print. Finally, there is a contagion in predetermined gatherings lacking among casual wayfarers. The position of the city official being that placards admittedly harmless in inscription are prohibitable qua placards. This issue need not be resolved and the prohibition of placards must be restrained. It is worthwhile noting that some of the discussions in Parliament on the English Public Order Bill revolve around provocation by placard and such legends on banners as, "Down with the means test", "Down with British Imperialism". House of Commons Debates above cited.

 To put these theoretical matters in more practical form: Our decree will run in favor of the plaintiffs and will enjoin the defending officials of Jersey City from in any way interfering with the plaintiffs in their right (1) to be and move about freely in Jersey City; (2) to distribute leaflets and circulars of a character similar to those being distributed at the time of the institution of this suit or of a substantially similar character; (3) to address public meetings in the parks of Jersey City subject only to the city's right to carry out the recreational purpose of those parks by arranging convenient times and places; (4) to display placards of the character of those displayed at the time of the institution of this suit or of a substantially similar character in or on the public places of Jersey City. We are not passing upon the claims advanced by the plaintiffs under the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. This because we issued our injunction on March 15, 1937 in favor of some of these same plaintiffs and in favor of others in legal positions precisely similar to others of these plaintiffs. That injunction adjudicated the same or substantially similar issues arising under the National Labor Relations Act, to those of this litigation. Our decision in that matter was appealed to the Circuit Court of Appeals for the

Third Circuit and is still undecided in that court. Therefore, whether technically res adjudicata both courtesy and efficiency demand our abstention until we receive enlightenment from on high.

Two concluding matters: We appreciated the cooperation of counsel for both sides, through the sometimes difficult proceeding. We feel that they are trying with us to solve a problem important, as we began by saying, to democracy. We have no final pride of opinion about our own solution. We do offer one admonition. The American tradition of brief writing has always seemed to us a meagre one and preclusive of real research. We suggest that the various bar associations and public libraries contain a wealth of material other than that found in text books and reported cases.

We hope that our failure to mention Jersey City's specific form of allergy has been noticed. It had reference to a supposed doctrinal infection of the plaintiffs or some of them. We offered our court as a humble forum for the purpose of calling witnesses under the fears and safeguards of the judicial process, in order that this ghost, if it is a ghost, might be forever exorcised or that this monster, if it is a monster, might be finally slain. This offer was not accepted and we are left with hearsay, some of it not single but triple. This hearsay may be relevant on the issue of the mental condition of the officials and people of Jersey City. It is plainly no proof of the ultimate facts. If the plaintiffs or any of them wish or need to be heard in the eyes of Jersey City or of any other part of the United States, they must accordingly seek that cleansing elsewhere. A fact which, incidentally, ob-

viates any consideration of that other cleansing required by courts of equity. Goldman v. Reyburn, 36 Pa. Co. Ct. R. 581; American League of Friends of New Germany v. Eastmead, 116 N.J.Eq. 487, 174 A. 156. The doctrine is difficult of application and has been criticized as applied to the obscurities of related sin. 48 Harvard Law Review 507; 15 Va. Law Review 275; 8 Texas Law Review 307.

Finally let us say this court happens to be as much or more personally allergic to the mentioned infection as the defendants or their constituents. We think it economically unworkable and worse than that we think that the methods seemingly pursued in its propagation are abhorrent to all true believers in democracy.

Eugene Lyons, whom we understand to be an experienced and originally sympathetic newspaper reporter, ends his most interesting book, Assignment in Utopia, in these words: "No plan for economic salvation must be accepted if it is diseased with disdain for life. Ultimately Russia will not be judged by how much bread it has given its people—by that standard other countries and other systems may be far more successful—but by how much freedom, self-respect, equality, truth and human kindness it has brought into the world."

We close with the suggestion made by a distinguished British statesman in the course of the Debates on the Public Order Bill several times referred to. He said in speaking about Sir Oswald Moseley's Fascists, "Why make martyrs out of clowns?" and we add wicked clowns at that.